ARTHUR K. BOURNE et al., as Trustees under the Will of FREDERICK G. BOURNE, Deceased, Respondents, *v.* ARTHUR K. BOURNE et al., Respondents, and MARJORIE BOURNE et al., Appellants, Impleaded with Others.

**Decedent's estate — trust — apportionment between capital and income of extraordinary dividends — courts guided by action of directors of corporation in computing value of capital and surplus — burden upon him who criticizes to prove that action of directors resulted from ignorance or mistake — trust estate consisting of stock of corporation — distribution to stockholders, after death of testator, of shares in subsidiary corporation and declaration of stock dividend — stock of subsidiary company properly allocated to capital — when no part of stock dividend should be allocated to life tenant.**

1. The proper apportionment of extraordinary dividends between capital and income where a trust estate contains corporate stock and

its creator has not expressed his wishes, considered, and rules governing such apportionment as indicated by the statutes and construed by our courts, summarized and applied.

2. In computing the value of the capital and surplus at the date of the creation of a trust and the same items after the dividend has been distributed, the court must be largely guided by the action of the directors of the corporation, and if they act in good faith in the exercise of business judgment their decisions may not be questioned. In the absence of evidence their good faith and the results reached by them are assumed to be correct. To alter their conclusion the evidence must show more than that their judgment has proved to be erroneous or that the question was debatable. The burden is upon him who criticizes their action to prove that it resulted from ignorance, mistake or error as to fact or law.

3. The testator created a trust estate, consisting of stock in a corporation and one of its subsidiaries, for the benefit of his children for their lives with remainder to his grandchildren. After his death the corporation distributed to its stockholders shares in the subsidiary corporation and a stock dividend on its own shares. The stock of the subsidiary company has properly been allocated to the capital of the trust estates since it was originally acquired from its accumulated surplus before the death of the testator. As to the extraordinary dividend of the corporation stock, the books of the corporation show that its capital and surplus at the time of the death of the testator was larger than after the stock dividend. On these figures no part of the stock dividend should be allocated to the life tenant.

4. After the death of the testator large sums were charged off upon the books, thus necessarily decreasing the surplus of the corporation. The finding is that the directors of the corporation in their judgment gave to this balance a reasonable and proper valuation. It cannot be said that the evidence establishes conclusively that the sums charged off were lost before the death of the testator and that the directors, because of ignorance or mistake, failed to make a proper deduction from the assets as they appeared on that day.

5. If losses to the capital of the trust estate have been sustained after its creation by the decrease of the capital and surplus of the corporation whose stock forms part of the trust fund, the directors may not only make good that loss out of earnings but if they subsequently distribute that surplus so made good, either by way of extraordinary cash or stock dividends, those dividends in so far as they represent the original capital of the trust estate should be allocated to the remainderman.

*Bourne* v. *Bourne*, 209 App. Div. 419, affirmed.

(Argued March 2, 1925; decided May 5, 1925.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered July 18, 1924, modifying and affirming as modified a judgment settling the accounts of the trustees herein entered upon the report of a referee.

*Nathan L. Miller* and *Anson McCook Beard* for appellants. An appreciation of the corpus of a trust estate not from earnings but from increase in the value undoubtedly belongs to the remaindermen, but an impairment in value cannot be made up out of earnings or income at the expense of the life beneficiary. (*Thayer* v. *Burr*, 201 N. Y. 155; *Matter of Schaefer*, 178 App. Div. 117; *U. S. Trust Co.* v. *Heye*, 224 N. Y. 242.)

*Milton C. Lightner* for plaintiffs, respondents. The finding of the Appellate Division as to the capital and surplus of the Singer Manufacturing Company and the intrinsic value of its stock was proper and is conclusive. (*Matter of Housman*, 224 N. Y. 525; *Frank* v. *Von Bayer*, 236 N. Y. 473; *Ga Nun* v. *Palmer*, 216 N. Y. 603; *Hall* v. *O'Brien*, 218 N. Y. 50; *Acme Realty Co.* v. *Schinasi*, 215 N. Y. 501; *Matter of Osborne*, 209 N. Y. 450; *U. S. Trust Co.* v. *Heye*, 224 N. Y. 242.) The evidence offered by appellants failed to prove any error in the company's valuation of its assets. (*Sokoloff* v. *Nat. City Bank*, 239 N. Y. 138.) The findings of fact made by the Appellate Division are conclusive and require the affirmance of the judgment. (*People* v. *Tax Comrs.*, 128 App. Div. 13; 196 N. Y. 39; *Clark* v. *Grant Locomotive Works*, 40 N. J. Eq. 114.) The argument that the intrinsic value of the corpus of the trust is to be considered as reduced by the subsequent losses of the corporation, although such losses are simultaneously offset by other earnings of the corporation, is unsound. (*United States Trust Co.* v. *Heye*, 224 N. Y. 242; *Matter of Osborne*, 209 N. Y. 450.)

*John Burlinson Coleman* for defendants, respondents. The evidence introduced by the appellants in an attempt to contradict the intrinsic value of the stock, as shown by the books of the corporation, was irrelevant and incompetent and improperly admitted. (*Matter of Osborne,* 209 N. Y. 450; *U. S. Trust Co.* v. *Heye,* 224 N. Y. 242; *Day* v. *Faulks,* 79 N. J. Eq. 66.) The evidence in the case does not support the finding of the referee that the Russian assets of the Singer Manufacturing Company had been entirely lost prior to March 9, 1919. (*R. C. & I. Bank* v. *Comptoir D'Escompte, etc.,* [1923] 11 K. B. 630; *Russian S. F. Republic* v. *Cibrario,* 198 App. Div. 875.) The extraordinary dividend of International Securities Company preferred stock was properly allocated to the principal of the trusts both by the referee and by the Appellate Division. (*U. S. Trust Co.* v. *Heye,* 224 N. Y. 242.)

Andrews, J. No more perplexing problem comes before us than the proper apportionment between capital and income of extraordinary dividends where the trust estate contains corporate stock and its creator has not expressed his wishes. The division made elsewhere has the merit of simplicity and certainty. Yet we have deliberately adopted what we conceive to be the more equitable rule, although it may involve the separate consideration of every case, with varying results fitting varying circumstances. In so doing we have been influenced by the public policy of the State as indicated by statutes affecting accumulations.

Our main purpose has been to preserve intact the capital of the trust estate, increased or decreased by any normal rise or fall in values, assigning to the life tenant but the income therefrom. Our decisions have been an attempt to enforce this purpose. And we do not, as we could not, always apply any one formula. At times a stock dividend has had for its object merely a change

in the number of shares representing the proportional interest of the stockholders in the capital and surplus of the corporation. At others merely an issue to them of shares in subsidiary corporations, formerly held by the corporation whose shares formed part of the trust estate. Here we had little difficulty in allotting such a dividend to the remainderman. On the other hand, if the stock of the subsidiary corporation had been acquired by the ·parent company from earnings made after the trust estate was established, we have allotted the dividend to the life tenant.

In other cases the directors have declared extraordinary cash dividends, payable from surplus profits, or the effect of their action has been to transfer these profits to capital and to divide them in the form of shares. What we wish to do is clear. These profits may have been made before the trust estate was created. Or after. Or both before and after. Under the first and second contingencies the cash or stock dividends go to the remainderman or to the life tenant respectively. Under the last they should be divided between the two in the proportion that the earnings before bear to the earnings after.

While the principle is simple, it is in the determination of this proportion that the difficulty arises. We have said that the answer may be obtained by a comparison of the value of the capital and surplus of the corporation at the date of the creation of the trust with the same items after the dividend has been distributed. It is true that this solution of the problem does not accomplish our purpose with mathematical accuracy. It is at best but a rough approximation to justice. An ordinary cash dividend may in fact impair the trust estate as it originally existed. We do not stop to inquire. We award such a dividend without question to the life tenant. The comparison may involve a rise of value to the advantage of which the remainderman is entitled. Again we ignore this possibility. Should the corporation subsequently

become insolvent distribution of its remaining assets among shareholders might cause injustice. This we do not consider. With all its imperfections, more than any hard and fast rule, we believe our theory reaches fair results.

In attempting to enforce it, however, a totally different class of questions may arise. How are we to compute the value of the capital and surplus of the corporation as of the two required dates. Are we concluded by such values as may be fixed by the directors on the corporate books? Or in every case may the assets be revalued; the date and amount of losses redetermined? If, to give a concrete illustration at the date of the creation of the trust upon these books the corporate capital is fixed at $1,000,000 and the surplus at a like amount are these figures to be disturbed? The answer depends upon the facts of each case. We must be largely guided by the action of the directors. Values of this or that item of assets may be greater or less than as stated by them on the two critical dates. But if they act in good faith in the exercise of business judgment we may not question their decisions. It would be impractical to revalue all the assets of the Standard Oil Company. So if losses occur it is for them to say when they took place and their amount. We will not review their judgment and in the light of later events hold that their previous hope that they might be avoided or their expectation of salvage were not justified. In the absence of evidence we assume their good faith and that the results reached by them are correct.

To alter this conclusion the evidence must show more than that their judgment has proved to be erroneous or that the question was debatable. He who criticises their action must prove that it resulted from ignorance or mistake or error as to fact or law. The burden is upon him as to any items which he disputes. But

12

investigation to this extent of the action of directors is always permissible. If in their balance sheet of a certain date they have included among the items of capital and surplus assets in truth previously destroyed, claims previously lost, in making our comparison we take account of that fact. Their delay in charging off such losses should not control us in apportioning the stock dividend. But we say again this does not permit a review by us of the exercise by the directors of their discretion and judgment. If they believe, in view of the facts before them, that a loss will be escaped or if they charge off a part of such loss believing that the balance sheet represents the salvage value of any claims or demands which the corporation may possess, we will not review their action. No subsequent train of events showing that their judgment was mistaken or their hopes vain will alter this result.

Another situation may arise in which the action of the directors taken in good faith controls our decision. After the creation of the trust great and extraordinary losses may occur, wiping out in whole or in part the surplus of a corporation and so reducing the capital of the trust estate. If this is all that happens, no question can arise. But subsequently substantial profits may be gained. If in their discretion the directors distribute these profits among the stockholders by way of ordinary dividends, they must be paid to the life tenants. No dividend being declared, however, they may be retained as surplus, so that this item may be reinstated. Of such action the life tenant may not complain. Or the lost surplus being reinstated in whole or in part, the directors may divide it among the stockholders by means of an extraordinary cash dividend or adding it to capital may in effect divide it by means of a stock dividend. How in the last contingency the extraordinary cash or stock dividend shall be allocated between life tenant and remainderman we have never expressly decided.

In view of our general purpose, however, the answer is not doubtful. It is true that the capital having been once lost the declaration of such a dividend does not impair it as it existed after the loss. But as the net profits of a business would be the profits remaining after capital losses .had been made good, so in this case the net income to which the life tenant is of right entitled is the income after the principal of the trust estate has been restored. The decision of the directors to cause such restoration may not be criticised. Being restored the capital of the trust estate should no more be depleted than if no loss had occurred. Nor is this rule unjust to the life tenant. Ever thereafter he receives the income from the estate as it originally was fixed. If we held otherwise in extreme cases the capital of the trust estate might be wholly lost. More than that, where the loss was not total the life tenant would receive the income on the capital as depleted. He would also receive not only the income on but the principal of the amount lost and restored. The remainderman would ultimately obtain but a portion of the original principal of the trust fund to which he was once entitled.

These principles enable us to answer the problem presented on the appeal before us. Mr. Bourne died on March 9, 1919. By his will he created trust estates, consisting of the stock of the Singer Manufacturing Company, for the benefit of his children for their lives with remainder to his grandchildren. In the fall of 1920 the corporation distributed to its stockholders shares in the International Securities Company, a subsidiary company, all of whose capital stock had previously been owned by it, and also a stock dividend of fifty per cent on its own shares.

The stock of the International Securities Company has properly been allocated to the capital of the trust estates by the courts below. It was originally acquired by the Singer Company from its accumulated surplus, and we

have the finding of fact, unanimously affirmed, that it was so acquired prior to Mr. Bourne's death. An inconsistent finding was reversed by the Appellate Division.

As to the extraordinary dividend of the Singer stock itself the books of the corporation show and it is so found as a fact by the Appellate Division that its capital and surplus on March 9, 1919, amounted to $133,-210,779.68. The referee finds and his finding is unanimously affirmed that after the stock dividend these same items amounted to $127,346,659.12. If these figures are correct it is obvious that no part of the stock dividend should be allocated to the life tenant, and this was the result reached by the court below.

The claim of the appellants may be considered under two main heads. After Mr. Bourne's death, many millions of dollars of great and unusual business losses were charged off upon the books, thus necessarily decreasing the surplus. If this action on the part of the directors was due to their ignorance of the facts or their mistake as to the law; if in truth all these losses had been incurred before March 9, 1919, then the capital and surplus account as of that date was by so much in error. It should be diminished by the amount of these losses, and if so diminished it will be found that the life tenants are entitled to a portion of this stock dividend. All this is true, provided the basic proposition is sustained. Have the appellants, for the burden as we have seen is on them, a finding that these losses were incurred at the date they assert or have they a request for such a finding supported by uncontradicted evidence? Is there even evidence that would require such a finding if requested?

Of these losses many millions resulted from business transacted in France, Italy, Belgium and other countries outside of Russia. These losses the referee finds occurred after Mr. Bourne's death. This finding the Appellate Division reversed, but it made no finding to the contrary. Nor do we discover evidence that conclusively establishes

that such a finding should be made.    Indeed the appellants argue that there is no evidence that even goes to the extent of justifying such a reversal — that what there is conclusively establishes that the referee was right. Nor do they request such a finding.    All they ask is that it be found that such losses were incurred either before or after March 9, 1919, which must be true but is immaterial on the point before us.

Some $12,000,000 represent the so-called Russian losses.    The Russian investments amounted originally to over $80,000,000.    Of this sum all but $12,000,000 had been charged off prior to December 31, 1918.    In the balance sheet of that date, and on March 9th following, this balance still appeared among the assets of the company.    Later they were charged off as a total loss. The referee found that the loss in fact occurred before March 9th.    This finding was reversed by the Appellate Division.    The record contains evidence justifying this reversal.

This $12,000,000 consisted of something over $4,000,000 of Russian government bonds, of nearly $5,000,000 of stock in a subsidiary company which did business for the Singer Company in Russia and of something over $2,000,-000 of accounts due to it by that subsidiary company. There seems to be no evidence as to what proportion of their face value was placed on these assets by the directors or whether any deductions whatever were made therefrom.    Apparently, however, the directors used their best judgment in giving to them a value of $12,000,000. As to all the Russian assets they had showed reasonable conservatism in writing off when they did the greater part as lost.    The finding unanimously affirmed is to the effect that they in their judgment gave to this balance a reasonable and proper valuation.    We cannot say that even knowing what we know now $12,000,000 was not a fair salvage value to be placed on these assets on that date.    It is true that in the event they proved a

total loss as was determined later by the directors, but this is not the test. At the date of this balance sheet was their value a question of judgment? Or was there no place for the exercise of discretion? As to the Russian bonds there seems to have been a decree accepted by the Third Congress of the Soviets in January, 1918, annulling all loans made to the government of the Czar. There was another decree on February 8, 1918, stating that all loans contracted by former Russian governments which " are specified in a special list " (the list not being given) are canceled but that same decree provided that " the short term series of state treasury bonds retain their validity." What particular bonds these were we do not discover. They may have been and there is some indications that they were short term treasury bonds. If so they have never so far as appears been confiscated and the burden of proof is on the appellants. If they represented loans to the Kerensky government this is also true. Even if they were issued by the Imperial government in view of the general expectation at the time that the life of the Soviet government would be short no business man would have written them off as worthless.

As to the subsidiary company, doubtless it with its assets was proclaimed the property of the Soviet government by a decree which went into effect on June 28, 1918, but until seized its various enterprises were considered as leased to it without the payment of rental and its directors were to finance its enterprises as before and receive income from them on the former basis. Banks were nationalized in December, 1917, but deposits in them were apparently not taken although but small amounts were to be drawn out on any one occasion. Further exportation of money abroad was prohibited but payments in foreign exchange might be made under certain conditions. Again no business man would have written off its stock or the accounts receivable from it as valueless on March 9, 1919. Nor have we any basis

for a judgment on this question. What deposits or what property the subsidiary company might have abroad unaffected by Russian decrees we do not know. At least until the company and its property was actually seized there was a fair hope for its continuance and rehabilitation.

With all these circumstances in view we cannot say that the evidence establishes conclusively that this $12,000,000 was lost before March 9th and that the directors because of ignorance or mistake failed to make a proper deduction from the assets as they appeared on that day.

The appellants ask us to view the situation from another angle. Even assuming these losses in fact occurred after March 9, 1919, concededly the earnings of the corporation in 1919 and 1920 amounted to $37,824,-161.97. But a comparatively small part of these earnings was distributed as dividends, although in those years the stockholders did receive between sixteen per cent and seventeen per cent on their stock. The greater portion, however, was credited to the so-called "Realization Reserve." In other words, it was added to the surplus, so making good the various losses charged off after March 9th and preserving it intact as it stood on that date. While this might be done, it is said that where this surplus was subsequently practically distributed by way of the declaration of a stock dividend, the proportional part thereof attributable to earnings made after Mr. Bourne's death should be allocated to the life tenants. This question we have already considered. We have reached the conclusion that if losses to the capital of the trust estate have been sustained after its creation by the decrease of the capital and surplus of a corporation whose stock forms part of the trust fund, the directors may not only make good that loss out of earnings but if they subsequently distribute that surplus so made good, either by way of extraordinary cash or stock dividends, those dividends in so far as

they represent the original capital of the trust estate should be allocated to the remainderman.

Our conclusion is, therefore, that the judgment appealed from should be affirmed, with costs to the respondents.

HISCOCK, Ch. J. (dissenting).   Inasmuch as I am unable to concur with the views held by my associates in this important matter I desire briefly to state my reasons for such disagreement.

The substantial features of the trust under consideration are the familiar ones of income to life tenants and principal to remaindermen.   The principal of the trust was constituted of capital stock of the Singer Manufacturing Company and I shall accept the view adopted by the prevailing opinion that the so-called Russian losses of $12,000,000 were suffered by that company after the trust took effect in 1919.   The directors of the corporation set out to repair these and other losses by carrying to the capital accounts of the corporation many millions of dollars concededly representing current profits after the trust took effect.   If these directors had elected permanently to retain these current earnings as part of their capital accounts instead of distributing them, of course within the restrictions of good faith on the part of the directors the life tenants would have had no claim to relief.   But they did not do this.   They subsequently made an extraordinary dividend which it is admitted was in part a distribution of these current earnings which temporarily had been placed by the directors in their capital accounts.   Under these circumstances I am unable to see any good reason why the life tenants should not have their share of the dividend representative of these earnings.

Only two reasons are given for the opposite view.

In the first place it seems to be thought that because the directors of the corporation temporarily elected to treat these current earnings as capital, the courts should regard

them as having been permanently transferred into capital for the purposes of the trust, which is quite a different thing. For the purpose of determining what was income and what was principal in such a trust as this we have repeatedly refused to be bound by the action of the directors of the corporation whose capital stock constituted the corpus of the trust.

The second reason given for the action which is to be taken is furnished by the theory that where the principal of a trust is impaired after the death of the testator such impairment ought to be repaired at the expense of the life tenant by carrying to such principal current earnings. Concededly no such rule has ever yet been laid down by this court. In fact the only thing which has ever been said on the subject was opposed to such view. (*Thayer* v. *Burr*, 201 N. Y. 155.)

It seems to me that this rule will operate as an arbitrary disregard of the testator's intentions in creating the trust and in addition will be discriminatory and unjust.

The testator has provided that the life tenants should have the current income and the remaindermen the principal and I fail to find anything which authorizes the court to overturn this intention when a dividend is made and use the income which belongs to the life tenants for the purpose of repairing the principal which belongs to the remaindermen. The administration by the courts of these trusts is difficult and complicated enough already and we ought not to add a new difficulty especially if it will overturn the testator's intention.

In the second place I think that the rule is unjust as between remaindermen and life tenants. We have held that if the principal of the trust is increased by some cause other than addition of current earnings as, for instance, stock of a corporation becoming more valuable, this increment does not constitute earnings which may be claimed by the life tenants. But now, instead of holding the correlative of this rule and imposing upon

the remaindermen who enjoy the benefits of such an increment, the disadvantages of a decrease in the value of principal through losses, we say that the life tenant must be compelled to make up those losses.   In other words, the life tenant seems to lose whatever happens.

If instead of doing as proposed we should allow the impairment of the principal of the trust to stand at least as against repairment by current earnings, both remaindermen and life tenants would in an equitable manner share and bear this loss.   The remaindermen would lose through depreciation in the value of the principal unless later made up, and the life tenants would suffer that diminution of current earnings which naturally would come from a reduced capital.   This would be equitable and fair.

It is no answer to say that when the principal of the trust is made good through appropriation of current earnings, the life tenants will then receive interest on the capital of the trust as it was at the time the latter took effect and thus the intent of the testator will be carried out.   The trouble with this theory is that current earnings which belong to the life tenants are appropriated to the restoration of the principal of the trust and the life tenants then simply receive interest on a principal which has been created at their expense by appropriation of current earnings; they receive interest on principal when they are entitled to both the principal and the interest as being part of the current earnings.

CARDOZO, POUND, McLAUGHLIN, CRANE and LEHMAN, JJ., concur with ANDREWS, J.; HISCOCK, Ch. J., dissents in opinion.

Judgment affirmed, with costs.