In the Matter of the Estate of CATHERINE JAMES, Deceased.

Surrogate's Court, New York County, May 11, 1931.

*Stewart & Shearer* [*Harry K. Davenport* and *Kenneth W. Brown* of counsel], for the trustee.

*Reeves, Todd, Ely, Price & Beaty* [*Richard Ely* of counsel], for the life tenant.

*William B. Stitt*, special guardian.

FOLEY, S. In this accounting proceeding a question arises as to whether a certain distribution of stock received by the trustee is to be retained in the trust as capital, or whether some of the shares are to be allocated as income to the life tenant. On November 30, 1926, the trustee held in capital account 217 shares of the Jeddo-Highland Coal Company. The name of the corporation has since been changed and a division in stock has taken place whereby the number of shares involved here has been increased in the ratio of

fourteen to one. The latter change, however, does not affect the merits of this decision.

The circumstances of the stock distribution are novel. John Markle, the dominant factor in the affairs of the corporation, desired to retire and to liquidate his stock holdings in the company. He owned a majority of the stock — 25,100 shares out of 50,000. An arrangement was made by the corporation to purchase this stock from Markle for approximately $8,785,000. The terms of the sale called for all cash, with the exception of $1,255,000 of second mortgage bonds of the company, which were subsequently delivered to Markle as part of the selling price. The value of all the corporate assets, as represented by capital and surplus at this time, was about $6,000,000. The proposed purchase price for half of the stock was in excess of the value of all of the stock. In order to justify the purchase of the stock it was necessary to write up the value of certain of the assets of the corporation. Thereupon the values of certain mines, leaseholds of coal properties and other assets were increased for this purpose immediately before the transaction by the sum of approximately $6,000,000. In order to meet its cash requirements for the purchase, the company was compelled to borrow on first mortgage bonds the sum of $4,000,000. The net proceeds of this loan were $3,740,000. It appears from the rather meagre financial statements which have been filed with the surrogate that the book value of each share of stock immediately after the write-up and just before the purchase by the corporation of Mr. Markle's stock may have been as low as $225 per share. On the most favorable figures the book value could not have exceeded $240 per share. The selling price by Markle to the corporation was $350 per share, or at least $110 more than the book value of the stock. Immediately after the completion of this transaction with Markle, the company distributed 24,900 shares of the Markle stock, which had momentarily found its way into the treasury of the corporation, by issuing an additional share for each share formerly held to each of the former minority stockholders. The company retained the remaining 200 shares of the Markle stock in its treasury. Each stockholder thus had two shares for each share previously held. A further step in this interesting financial manipulation was the reduction of the capital from $5,000,000 to $1,245,000. This was accomplished simultaneously with the purchase of the Markle stock by reducing the par value of each share of stock from $100 to $25.

I hold that no part of the distribution of stock received by the trustee is apportionable to the life tenant. All of the extra shares issued to the trustee constituted capital which must be retained

within the trust. Markle received from the corporation at least $110 per share more than its book value at the time of the sale and this loss was sustained by the minority stockholders including the trustee here. In other words, Markle's gain over the book value was an impairment of the value of the holdings of the other stockholders. The total impairment in the corporation's financial position by this purchase must be obtained by multiplying 24,900 shares by $110, the loss per share, or an aggregate of $2,739,000. This transaction is nowhere explained in the account or in the information obtained from the corporation or its accountants, but the necessity for reconciling the loss may perhaps be found in the attempted adjustment sought to be made by the reduction of capital from $5,000,000 to approximately $1,250,000, or a reduction of about $3,750,000. Whatever alleged basis of legal authority may may have been claimed by the corporation officers to justify the transaction, it cannot be held here to authorize the distribution of a fictitious surplus as between the life tenant and remaindermen. We are required by the authorities applicable to the distribution of stock dividends to " look into the facts, circumstances and nature of the transaction and determine the nature of the dividend and the rights of the contending parties according to justice and equity." (*Matter of Osborne*, 209 N. Y. 450, at p. 475; *Equitable Trust Co.* v. *Prentice*, 250 id. 1; *Pratt* v. *Ladd*, 253 id. 213.) In *Bourne* v. *Bourne* (240 N. Y. 172) one of the tests is laid down in the following language: " At times a stock dividend has had for its object merely a change in the number of shares representing the proportional interest of the stockholders in the capital and surplus of the corporation. * * * Here we had little difficulty in allotting such a dividend to the remainderman." Upon the latter theory the contention of the trustee here, that all the distribution should be retained in capital, seems to be correct. Its counsel contends that all the trustee possessed after the distribution of the Markle stock was two shares in place of the one originally held. That these two shares together represented the same holding in the corporation. He contends that each stockholder had but two shares for each share previously held, but with a large assumed corporate indebtedness against it. He urges that the stockholders owned no larger proportionate interest in the corporation, simply holding two pieces for each piece they previously held in the entity or in the equity after the large indebtedness had been incurred for the purpose of absorbing the Markle stock. This argument finds further basis for support in *Equitable Trust Co.* v. *Prentice* (250 N. Y. 1, at p. 12): " Stock dividends in the true sense, *i. e.*, dividends capitalizing surplus as distinguished from those payable in the stock

of a subsidiary  *  *  *  have predominantly the quality of an increment to principal, though at times, in furtherance of intention, they have been classified as income.  *  *  *  Upon the distribution of a stock dividend, ownership of the assets is precisely as it was. ' A stock dividend does not distribute property, but simply dilutes the shares as they existed before.' "

*Thayer* v. *Burr* (201 N. Y. 155) presented a somewhat similar situation. There the Adams Express Company made a distribution of bonds which represented the increased value of certain securities held by that company. That part of the distribution which did not represent earnings was held to be capital. The increased or enhanced market value of these securities, represented by bonds, did not become distributable to the life tenant. " It is very plain that the life tenant was not entitled to this increase in the value of the corpus of the trust any more than she would have been chargeable for any depreciation in the value of the corpus."

In the present case the written-up value of the properties, approximating $6,000,000, was almost balanced by the debts which the company contracted in the form of the mortgage bonds.

The special guardian for the remaindermen argues on another theory that the book value of the two shares immediately after the distribution was not equal to the value of one share before acquisition of the Markle stock. This impaired value would seem to follow as a matter of course because of the excess payment over book value to Markle of the sum of approximately $2,739,000 out of the company's assets. The impairment per share as contrasted with the book value before acquisition amounted to at least $110, and the impairment after the distribution of the stock amounted to at least $52.50 per share in the hands of the trustee.

I further hold that in this transaction there was no distribution of profits as such and that none of the additional stock received by the trustee can be earmarked as accumulated earnings or surplus distributable to the life tenant. The amended account, filed by stipulation of the parties, confirms this conclusion for the representatives of the company stated in answer to a written inquiry from the attorneys for the trustee that " No portion of the stock dividend paid in 1926 was treated as from earned surplus." Moreover, the condition of the company on December 31, 1929, with any new surplus set up as of that date by reason of a further write-up of assets, cannot affect the issue here which must be determined as of November 30, 1926 — the time of distribution of the stock. It is immaterial, of course, as to what may have occurred by reason of subsequent events. The test is to be made as of the exact time of distribution. It does seem, however, that the court cannot ignore

the recent tremendous shrinkage in the value of commodities — nationwide and worldwide in its scope. That condition only emphasizes the need of caution in authorizing distributions to life tenants. None should be made unless the right of the life tenant to receive part of the distribution is clearly established. Counsel for the life tenant contends that the assets which were written up in value were purchased out of earnings accumulated after the inception of the trust. A mere revaluation of company assets avails little in the ascertainment of the nature of the distribution. No actual sale of the assets, which might have established actual profits, took place. In the face of the decline of commodity values, the write-ups of a few years ago may be deflated into write-downs in the value of the same assets to-day or a year hence. In the present case all the equities are in favor of the remaindermen and the capital of the trust fund should not be further endangered or impaired by an unjustified distribution. The new shares in their present converted form must all be retained by the trustee as capital.

Submit decree settling the account accordingly.