In the Matter of the Judicial Settlement of the Accounts of Proceedings of JEANNE G. POSTLEY and CHEMICAL BANK & TRUST COMPANY, as Trustees of the Trusts Created by the Sixth Article of the Last Will and Testament of STERLING POSTLEY, Deceased, for the Periods from Their Inception to the Respective Dates Mentioned in the Accounts.

JEANNE G. POSTLEY, Individually and as Trustee, etc., of STERLING POSTLEY, Deceased, Appellant; CHEMICAL BANK & TRUST COMPANY, as Trustee, etc., of STERLING POSTLEY, Deceased, and CLARENCE STERLING POSTLEY, Respondents.

Second Department, June 18, 1937.

*Dallas S. Townsend* [*Gardner D. Howie* with him on the brief], for the appellant.

*William H. Gambrell* [*Eustace W. Tomlinson* with him on the brief], for the respondent Chemical Bank & Trust Company, as trustee.

JOHNSTON, J. This is a proceeding for the judicial settlement of the accounts of Jeanne G. Postley and Chemical Bank & Trust Company as trustees under the will of Sterling Postley, deceased. The sole question involved concerns the allocation of certain cash dividends received by the trustees upon stock of the Singer Manufacturing Company, held by them as part of the principal of two of the three trusts set up by the deceased. Jeanne G. Postley, testator's widow and the beneficiary named in the trusts, contends the dividends should be treated as income and paid to her. The remaindermen, whose wives have a contingent remainder interest, are Brooke Postley and Clarence Sterling Postley, testator's sons. Neither son objects to the widow's claim. The only objection is made by the corporate trustee. The trustees, among other things, with which we are not concerned, asked the surrogate to determine whether the dividends should be considered as principal or as income, or partly as principal and partly as income, and, if so, in what respective amounts.

The facts are not in dispute. The testator died November 12, 1928, leaving a will dated April 13, 1916, a codicil dated October 6, 1925, and a codicil dated December 1, 1926, which were admitted to probate on November 28, 1928. By the will and codicils the testator gave his wife his residences at Oyster Bay, N. Y., and at Palm Beach, Fla., together with certain personal property and the life use of certain other property, and $20,000 in cash. The testator

gave his residuary estate to his trustees " to collect and receive the rents, interest, dividends, income and profits thereof in trust " and to divide such residuary estate into three trusts, which may be summarized as follows: Under trust No. 1 testator's widow was to receive the income for life, with remainder over to his two sons and with alternative provisions in the event of the death of either before attaining the age of thirty. Under trust No. 2 she was entitled to the income until her son Brooke should reach the age of thirty years, with alternative provisions for remainder over. Trust No. 3 was set up for testator's son Clarence. The widow has no interest in trust No. 3, which has been distributed, and it is not involved in this proceeding. The will empowered the trustees to sell any property in the estate. The first codicil authorized them to retain any property, particularly the Singer Company stock. The second codicil directed the trustees to retain all the Singer Company stock until the termination of the trusts, and provided that the trustees shall have no power of sale of such stock.

Included among the property delivered on October 8, 1929, by the executors to themselves as trustees, was the Singer Company stock, valued at $499 a share. Of this stock 3,784 shares, of the value of $1,888,216, were placed in trust No. 1, and 3,783 shares, of the value of $1,887,717, were placed in trust No. 2. From March, 1928, to June, 1931, the company, every three months, paid a regular dividend of $2.50 a share, which it denominated a " quarterly " dividend. Accompanying each of such quarterly dividends was a dividend ranging from $2.50 to $5.50 a share, which the company denominated " extras; " that is, the quarterly and extra dividends were declared and paid on the same days as a unit. During the period mentioned, fourteen of such unit dividends were paid. From September 9, 1931, to December 5, 1933, the company, every three months, paid dividends ranging from $1.50 to $3.50 a share. During this period ten of such dividends, but no other dividends, were paid. From March 9, 1934, to December 4, 1935, the company, every three months, paid a regular dividend of $1.50 a share, which it denominated a " quarterly " dividend. Accompanying each of such quarterly dividends was a dividend ranging from $1.00 to $2.50 a share, which the company denominated " extra." That is, the quarterly and extra dividends were declared and paid on the same days, as a unit. During this period eight of such unit dividends were paid. The resolutions of the board of directors declaring the dividends for the four quarterly periods of June 6, 1934, September 5, 1934, December 7, 1934, and March 6, 1935, state the " extra " dividend is payable " from the accumulated surplus." Accompanying the last unit dividend,

declared on December 4, 1935, was an additional dividend of $15 a share, which the company denominated " special." Until the payment of the " special " dividend of December 4, 1935, all the dividends received by the trustees were allocated to income and paid to the widow.

The surrogate held that the excess of total dividends from 1928 to 1935, inclusive, over total balances to surplus during that period, should be deemed principal as matter of law. The widow appeals and urges: (1) The testator intended that all Singer cash dividends be paid to her as beneficiary; and (2) all such cash dividends, as matter of law, are income and payable to her. The surrogate disregarded the designation of the dividends — quarterly, extra, and special. He simply took the aggregate of all the dividends paid from 1928 to 1935, inclusive, and the aggregate of all the balances to surplus for the same period, and found the excess of dividends to be $19,866,034.67, or $22.073 a share. Therefore, the surrogate concluded that the capital of each trust had been impaired to the extent of $22.073 a share, or $83,524.33 in trust No. 1, and $83,502.16 in trust No. 2, and directed that restitution be made by the widow of the overpayment to her to the extent of $17,304.23 in trust No. 1, and to the extent of $17,299.66 in trust No. 2, and also directed that the amounts held by the trustees in the suspense account be allocated wholly to principal. During this entire period — 1928 to 1935 — the capital of the corporation remained the same — $90,000,000 — but the surplus fluctuated from $73,000,000 in 1928, 1929 and 1930, to $62,000,000 in 1931, $58,000,000 in 1932, $63,000,000 in 1933 and 1934, and $51,000,000 in 1935. The surrogate treated all the dividends, irrespective of their amount, source, designation, or the company's dividend policy, as extraordinary dividends. It was on this premise that the surrogate directed the apportionment and decided that the capital of the trust had been impaired to the extent that the total dividends for these seven years exceed the total balances to surplus. In my opinion this was error.

In deciding upon the apportionment between the life beneficiary and the remaindermen, the surrogate relied on *Matter of Osborne* (209 N. Y. 450). There a similar trust was created and the Singer Company stock also was involved. Upon the death of the testator in 1908 the capital stock of the company was $30,000,000 and its surplus about $37,000,000. In June, 1910, the surplus had increased to about $51,000,000. The directors thereupon increased the capital stock to $60,000,000 and declared a stock dividend of $30,000,000. As a result the trustees received a stock dividend on

2,920 shares, of the par value of $100. The question at issue was the proper disposition to be made of this stock dividend. The court in its opinion calls attention to the fact that no question before the courts has been more troublesome, and reviews the English and American authorities and points out that with respect to extraordinary dividends it is impossible, without doing a grave injustice to the remaindermen, to adhere to the rule applicable to ordinary dividends, namely, that they are deemed to have been earned as of the date of their declaration and are payable to the life beneficiary. The court then lays down the following rules with respect to ordinary and extraordinary dividends: " 1. Ordinary dividends, regardless of the time when the surplus out of which they are payable was accumulated, should be paid to the life beneficiary of the trust. 2. Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund." The theory underlying the apportionment rule is " that where extraordinary dividends entrench upon the capital of the trust fund they should be returned to such trust fund so far as necessary to preserve the same." In the *Osborne* case the court, on a motion to amend the remittitur, further clarified the latter rule above set forth and pointed out that the apportionment rule applies only to extraordinary cash or stock dividends, and also indicated the method by which the apportionment is to be made (p. 484).

As stated by the late Justice JAYCOX, speaking for this court: " The holding of the court in *Matter of Osborne* (*supra*) is that all ordinary dividends are payable to the life beneficiary, as are also all extraordinary dividends which do not entrench upon the capital of the trust fund." (*Matter of Stranahan*, 204 App. Div. 16; affd., 237 N. Y. 530.) In *Bourne* v. *Bourne* (240 N. Y. 172, 176) the court said: " An ordinary cash dividend may in fact impair the trust estate as it originally existed. We do not stop to inquire. We award such a dividend without question to the life tenant."

There is no doubt that with respect to the ordinary cash dividend it " is income for the life tenant, though it be paid out of earnings that antedate the trust." (*Equitable Trust Co.* v. *Prentice*, 250 N. Y. 1, 11.) In *Matter of Hagen* (262 N. Y. 301, 305) Judge CRANE

said: " Cash dividends go to the life beneficiary — no question about that — stock dividends, and stock dividends only, go to the life beneficiary if they have been declared out of subsequent earnings; if not, they must be apportioned." The words " cash dividends," used by Judge CRANE, in the light of *Matter of Osborne,* undoubtedly refer to ordinary dividends.

The prevailing rule in this country gives ordinary current dividends, without apportionment, to the life beneficiary if declared during the continuance of the life interest and to the remaindermen if declared before the commencement or after the termination of the life interest. (24 A. L. R. 10; 56 id. 1288; 72 id. 981; 101 id. 1379, and cases cited.)

In the Restatement of the Law of Trusts, the rule enunciated in *Matter of Osborne* has been adopted. It is there stated: " ordinary dividends declared during the [trust] period out of earnings of the corporation are income " (§ 236-a); " extraordinary dividends declared during the [trust] period, whether in cash or in shares of the corporation or in other property, are income to the extent and only to the extent that they are declared out of earnings of the corporation which accrued subsequent to the creation of the trust or the acquisition of the shares by the trustee " (§ 236-b).

*Matter of Osborne* is thus recognized as setting forth the law of this State. In the apportionment of extraordinary dividends it has been consistently followed, although not without complaint of the complications and the vexing problems it has produced. (*Bourne* v. *Bourne, supra; Matter of Hagen, supra.*)

If the dividends here involved were extraordinary, then the apportionment made by the surrogate was correct. Appellant contends the apportionment is incorrect because during some years the earnings exceeded the dividends and there is nothing to indicate during what period the surplus paid out in other years had accumulated. While this may be true, it cannot be denied that a fair balance is struck for all the years if the total dividends and the total balances to surplus are aggregated and one set off against the other. To the extent that there is an excess of dividends over such balances, this excess could have been paid only out of the surplus which existed before or during 1928. This is shown by the fact that in 1928 the company had a surplus of $73,000,000 and in 1935 a surplus of only $51,000,000. However, as I have already indicated, the more fundamental question is whether or not the dividends received by the trustees from 1928 to 1935 come within the category of ordinary or extraordinary dividends. If ordinary, they go to the life beneficiary as income. If extraor-

dinary, then the principal of the trust must be made whole to the extent that it has been depleted and the dividends have been properly apportioned to accomplish this purpose. " Whether a dividend is an ordinary or an extraordinary dividend depends upon all the circumstances of the case." (Restatement of the Law of Trusts, § 236.) The evidence shows all the dividends, including the special dividend, are ordinary. Moreover, the intention of the testator as disclosed by his will is that they should be so treated.

Prior to the testator's death it was the practice of the company to pay " extra " dividends, which ranged from $2.50 to $5.50 a share. These extras accompanied the regular quarterly dividend of $2.50. After the testator's death the " extra " dividends ranged from $1.00 to $4.50 a share, and this practice was continued. Therefore, I believe it fair to say that the practice of paying an " extra," together with the regular quarterly dividend, was the established policy of the company. Of couse, the company readily could have combined the two dividends, but apparently the directors believed it to be the wiser business course to have a uniform dividend fixed at a certain minimum, which the company could always meet, and an extra dividend, which would fluctuate with the company's cash position. Up to June 4, 1931, the company, without exception, adhered to this policy of declaring dual or unit dividends. This policy was interrupted from September 9, 1931, to December 5, 1933. During the latter period the company omitted the extra dividend and paid only the regular quarterly dividend, which ranged from $1.50 to $3.50. But thereafter the former policy was resumed. From March 9, 1934, to December 4, 1935, the company, without exception, continued to pay both dividends, but the regular quarterly dividend was reduced to $1.50 and the extra to $2.50 (with one exception as to the latter in March, 1934, when it amounted to $1). On December 4, 1935, the company paid a " special " dividend of $15 a share.

It does not appear why the company's dividend policy from September 9, 1931, to December 5, 1933, was interrupted and extra dividends skipped, but perhaps it is fair to say that the interruption of the general policy and suspension of the extra dividends were due to the economic depression. In any event, the resumption of the company's policy, beginning with 1934, clearly shows that this suspension of the " extras " was temporary. The only deviation from this established policy is the $15 special dividend declared on December 4, 1935. This was in addition to the regular quarterly dividend of $1.50 and the extra dividend of $2.50 declared on that date. As far as the record shows,

the highest extra dividend was $5.50. Appellant claims that this special dividend was declared to compensate the stockholders for the diminished dividends which the company paid in prior years, from 1931 to 1934. Appellant probably is right, although there is no proof to show the particular purpose the directors had in mind in declaring this special dividend. But whatever the purpose, I do not believe, in view of the liberal dividend payments in the past, that this special dividend may be termed an extraordinary dividend. In this connection it may be noted that in nearly every case where a dividend was considered extraordinary the amount thereof was substantially more than fifteen per cent. It was in every sense an isolated extraordinary dividend and in no way reflected the continuance of a policy. Thus, in the *Osborne* and *Bourne* cases, where the Singer Company stock was involved, the dividend was one hundred per cent and fifty per cent respectively, and they were stock dividends.

Whatever doubt there may be as to whether all the " extra " dividends here, as well as the " special " dividend, should be considered ordinary, I believe is dispelled by the testator's intention as declared by his will. It should be remembered that it is only in the absence of any ascertainable intention of the settlor that the rule as to apportionment of extraordinary dividends is invoked. But that rule must yield to the intention of the testator if it fairly can be ascertained, and whenever the testator's intention as to dividends is manifested by the terms of his will it must be followed. (*Matter of Osborne, supra; Lanier* v. *Taylor,* 186 App. Div. 270.) Here the testator's primary purpose undoubtedly was to provide a substantial and regular income for his widow. The Singer stock comprises over seventy per cent of the trusts. By the second codicil the trustees were prohibited from selling this stock. Other than the income from the trusts, the only cash which the widow received from this large estate was a bequest of $20,000. The testator, by his will, also deprived his widow of all dower and of all right to commissions, although he named her as coexecutrix and cotrustee. He expressly made all stock dividends an accretion to principal. He must have been aware of the policy of the Singer Company to pay extra cash dividends, for he received them during his lifetime. In the light of his knowledge of the policy of the company to pay extra dividends every three months, in addition to the regular dividends, and his evident purpose to provide adequately and generously for his widow during her life, it is plain that when he gave her the income and profits from the principal of the trusts he had but one thought in mind: that she, during her

life, should enjoy all the income which he had enjoyed during his life.

Therefore, under the circumstances, the extra dividends and the special dividend should be regarded not as extraordinary but as ordinary dividends. In the absence of evidence of intent, the rule as to apportionment is invoked only in order to do justice between the life tenant and the remaindermen. It is a rule of expediency which has been adopted because it is presumed to do justice to both and at the same time to effectuate the intention of the settlor. Here justice and equity require that all the dividends be allocated to income. Bearing in mind the policy of the company, no one of the dividends, even the special dividend, is so large as to be classified as extraordinary. They all more nearly approximate the dividends received by the testator during his lifetime. To withhold any of the dividends from the widow would be adhering blindly to the apportionment rule without regard to its purpose.

The decree, in so far as it provides that the extra dividends and the special dividend form part of the principal and not of the income, should be reversed upon the law, with costs to appellant, payable out of the estate, and the matter remitted to the Surrogate's Court to make a decree providing that the extra dividends and the special dividend are income and not principal.

HAGARTY, DAVIS, ADEL and CLOSE, JJ., concur.

Decree of the Surrogate's Court of Nassau county, in so far as it provides that the extra dividends and the special dividend form part of the principal and not of the income, reversed upon the law, with costs to appellant, payable out of the estate, and matter remitted to the Surrogate's Court to make a decree providing that the extra dividends and the special dividend are income and not principal.