HALL PARK McCULLOUGH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 2399. Promulgated September 29, 1944.

*Marvin Lyons, Esq., William H. Harrar, Esq.,* and *George Craven, Esq.,* for the petitioner.

*Charles P. Reilly, Esq.,* for the respondent.

### OPINION.

MELLOTT, *Judge*: Petitioner seeks to set aside a deficiency in income tax for the year 1940 in the amount of $10,200.68 and to recover an overpayment of $2,938.57.

The sole question is the basis of 2,055 shares of the common stock of the Standard Oil Co. of California, sold by him during that year. The facts, which are found to be as stipulated, may be summarized.

Petitioner, a resident of Vermont, filed his income tax return for the calendar year in issue with the collector of internal revenue for the district of Vermont. It was prepared on the cash basis and showed a net income of $117,621.11. The tax shown to be due in the amount of

$61,692.54 was paid within three years before the filing of the petition. (Sec. 322 (d), I. R. C.)

In the return petitioner reported a loss on the sale of the stock of $35,592.19, one-half of which, or $17,796.10, he deducted as a long term capital loss. In the notice of deficiency the Commissioner determined that petitioner had derived a gain of $26,230.05 on the sale, one-half of which ($13,115.03) was taxable as a long term capital gain. He accordingly increased petitioner's taxable income by $30,911.13 ($17,796.10 + $13,115.03).

Petitioner's contention is that he sustained a loss of $52,934.78,[1] one-half of which is deductible. Respondent's present position is that the sale resulted in a long term capital gain of $21,921.84, one-half of which is to be taken into account in computing net income.

The parties agree that 425 of the shares had a basis in petitioner's hands of $9,125 and that the acquisition by him of 79 additional shares as stock dividends had no effect upon the basis of the whole block. The issue, therefore, is narrowed to the basis of 1,551 shares, acquired by petitioner from his mother on May 13, 1929, as a gift, the antecedent history of the stock being set out fully in the stipulation.

Petitioner's father died testate on May 29, 1915. Petitioner and his mother were appointed and qualified as executors of the estate on June 29, 1915, and acted as such until the death of the mother on July 5, 1938. Article twelfth of the decedent's will provides:

TWELFTH: I give, devise and bequeath all the rest, residue and remainder of my estate, real, personal or mixed, of every name and nature, wheresoever situated and whenever and however acquired (including any lapsed legacies) and all rights, claims and properties, real, personal or mixed, and whether now held or hereafter acquired by me, unto my wife Eliza Hall McCullough, for and during her natural life.

Articles thirteenth and fifteenth of the will provide that upon the death of the testator's wife the rest, residue, and remainder of the estate is to be held in trust for petitioner herein and his two sisters. Petitioner and his mother and the survivor were named as executors and trustees of the several trust funds.

At the time of the death of the testator he was the owner of 250.8 shares of the common stock of the par value of $100 per share of Standard Oil Co. of California, which stock became a part of his residuary estate. The fair market value of the stock on the date of his death was $284 per share, or $71,227.20.

On April 15, 1916, the executors received a 50 percent stock dividend in common stock of the corporation (125.4 shares) "making a total of 376.2 shares of such stock thereafter owned by said estate."[2] On

---

[1] In the petition a loss of $53,532.99 is claimed to have been sustained.

[2] The quotations are from the stipulation. The query intrudes at this juncture whether, under the law of the domicile hereinafter referred to, all of the stock should not have been distributed to the life tenant. It is passed, however, since neither party makes any point of it.

April 16, 1917, the executors received a 33⅓ percent stock dividend in common stock of the corporation (125.4), "making a total of 501.6 shares of such stock thereafter owned by said estate."[2] On April 16, 1917, six-tenths of a share was sold, "leaving 501 shares of such stock thereafter owned by said estate."[2] On March 10, 1921, there was a four-for-one stock split-up, the par value of the stock being reduced from $100 to $25 per share. On December 30, 1922, a 100 percent stock dividend in common stock was received.

On April 16, 1917, "pursuant to the provisions of said will and the law of the State of Vermont relating to the apportionment of stock dividends between principal and income,"[3] the executors delivered to Eliza Hall McCullough (hereinafter sometimes referred to as petitioner's mother or as the income beneficiary) 66 shares of the common stock out of the stock dividend of 125.4 received on that date. (See footnote 2.) The fair market value of the shares on that date was $284 per share, a total of $18,744. In 1921 she received 264 shares as a result of the four-for-one stock split-up referred to above and on December 30, 1922, she received 264 additional as a 100 percent stock dividend in common stock. The facts shown above are summarized in the table shown in the margin.[4]

---

[2] See footnote 2, p. 110.

[3] The rule of law referred to is the Pennsylvania rule, stated by the Supreme Court of Vermont in *In re Heaton's Estate,* 89 Vermont 550 ; 96 Atl. 21, to be : "* * * the life tenant receives all the profits of the corporation accumulated during the life of the trust which are released from corporate control and distributed among the stockholders during the life tenancy, regardless of the form of the distribution ; and the remainderman receives at the end of the term the corpus of the trust fund undiminished in value from what it was at the inception of the trust, * * * unless the creator of the trust has evidenced an intention that he shall receive more." Cf. *Matter of Osborne,* 209 N. Y. 450 ; 103 N. E. 723, 823 ; *U. S. Trust Co.* v. *Heye,* 224 N. Y. 242 ; 120 N. E. 645 ; *Bourne* v. *Bourne,* 240 N. Y. 172, 148 N. E. 180.

|  | Shares |  |  |
|---|---|---|---|
| [4] Stock owned by testator at time of death May 29, 1915 | 250. 8 | at $284 | $71, 227. 20 |
| Received by executors as stock dividend 4/15/1916 and retained | 125. 4 |  |  |

|  | Shares |
|---|---|
| Received by executors as stock dividend 4/16/1917 | 125. 4 |
| Distributed to income beneficiary | 66. 0 |
|  | 59. 4 |
| Less 6/10 share sold* | .6    58. 8 |
| Total | 435. |
| The 435 shares were exchanged in 4-for-1 split-up 3/10/1921 | 1, 740 |
| 12/30/1922, 100% stock dividend | 1, 740 |
| Total | 3, 480 |
| Stock owned by income beneficiary after 4/16/1917 | 66 |
| Exchanged in 4-for-1 split-up 3/10/21 | 264 |
| 12/30/1922, 100% stock dividend | 264 |
| Total | 528 |

*Petitioner concedes that the sale of 6/10 of a share reduced the basis $85.20 $\left(\dfrac{71227.20 \times 6}{501.6 \quad 10}\right)$, so the unrecovered basis is $71,142.

On December 30, 1922, the executors delivered to Eliza Hall Mc-Cullough, "pursuant to the provisions of said will and the law of the State of Vermont relating to the apportionment of stock dividends between principal and income, * * * as a distribution of income of said estate, 1,740 shares * * * out of the 100% stock dividend received by such executors on that date." The fair market value of the 1,740 shares was $60 per share, or a total of $104,400.

On April 23, 1923, Eliza Hall McCoullough, by reason of the distributions of shares of stock from the estate and the stock split-up and dividends received thereon, owned 2,268 shares of such stock. Pursuant to rights issued by the corporation to its stockholders she, on April 23, 1923, subscribed for 283½ shares at a total cost of $7,087.50. At this point her total holdings amounted to 2,551½ shares.

The California corporation was reorganized in 1926 and Eliza Hall McCullough, in a nontaxable exchange, received 2,551½ shares of the new (Delaware) corporation having the same basis in her hands as the 2,551½ shares of the California Corporation. After the exchange she continued to own the 2,551½ shares until May 13, 1929, on which date she made a gift of 1,551 of the shares to petitioner.

All of the stock dividends had been declared and paid out of surplus of Standard Oil Co. of California earned subsequent to March 1, 1913, and all of the dividend shares, which were distributed to petitioner's mother from the estate of her deceased husband, had been declared and paid out of earnings of the corporation subsequent to the death of petitioner's father.

At all times material to this proceeding the Standard Oil Co. of California, a California corporation, and its successor, the Delaware corporation, each had but one class of stock outstanding, namely, common stock.

The parties agree that under section 113 (a) (2), I. R. C.[5] petitioner's basis for the 1,551 shares is "the same as it would be in the hands of the donor." The question which evolves, therefore, is: What was the basis of the stock in the hands of petitioner's mother? Petitioner

---

[5] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

* * * * * * *

(2) GIFTS AFTER DECEMBER 31, 1920.—If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift, except that for the purpose of determining loss the basis shall be the basis so determined or the fair market value of the property at the time of the gift, whichever is lower. If the facts necessary to determine the basis in the hands of the donor or the last preceding owner are unknown to the donee, the Commissioner shall, if possible, obtain such facts from such donor or last preceding owner, or any other person cognizant thereof. If the Commissioner finds it impossible to obtain such facts, the basis in the hands of such donor or last preceding owner shall be the fair market value of such property as found by the Commissioner as of the date or approximate date at which, according to the best information that the Commissioner is able to obtain, such property was acquired by such donor or last preceding owner.

contends it was the fair market when received. Respondent contends it was zero. In the alternative each party contends it was a proportionate part of the basis of the original shares to the executors. The following schedule reflects the various contentions:

| Date Received | Description and value | Basis claimed by petitioner | Basis claimed by respondent | Alternative | |
|---|---|---|---|---|---|
| | | | | Basis per share | Aggregate basis |
| Apr. 16, 1917 | 66 shares. Value $284 per share. Total ___$18,744.00 | $18,744.00 | Zero | *$142.00 | $9,372.00 |
| 1921 | Four-for-one splitup. 264 shares | No change in aggregate basis | No change in aggregate basis | 35.50 | 9,372.00 |
| Dec. 30, 1922 | 264 shares rec'd. as 100% dividend | No change in aggregate basis | No change in aggregate basis | *17.75 | 9,372.00 |
| Dec. 30, 1922 | 528 shares | 18,744.00 | Zero | *17.75 | 9,372.00 |
| | 1,740 shares. Value $60 per share. Total $104,400. | 104,400.00 | Zero | 17.75 | 30,885.00 |
| Apr. 23, 1923 | 2,268 shares | 123,144.00 | Zero | *17.75 | 40,257.00 |
| | 283.5 shares purchased at $25 per share. | 7,087.50 | $7,087.50 | 25.00 | 7,087.50 |
| Total | 2,551.5 shares | 130,231.50 | 7,087.50 | | 47,344.50 |
| Per share basis | | 51.041152 | 2.777 | *18.555 | |

*Respondent refers to the $142 figure as the "diluted basis," an equal amount being attributed to the shares remaining in the estate. Petitioner reaches the same ultimate conclusion, that the shares had a basis of $17.75 per share, by dividing the aggregate basis ($71,142) by 4,008, the total number of shares owned by the estate and the life tenant.

The present controversy stems largely from *Eisner* v. *Macomber*, 252 U. S. 189, decided March 8, 1920. It was there held that the Revenue Act of 1916, in so far as it imposed a tax upon the stockholder because of a dividend in common stock on common stock, contravened Article I of the Constitution and was invalid. Following that decision, the Treasury Department ruled [6] that stock dividends were not taxable and in 1921 Congress enacted section 201 (d) of the revenue act of that year, providing that "a stock dividend shall not be subject to tax * * *." A similar provision was contained in each of the revenue acts through and including 1934.

In 1922 question arose whether stock dividends declared upon stock held in trust, which in accordance with the provisions of a trust instrument or state law were paid to the life beneficiaries rather than added to the corpus of the estate, constituted taxable income to the beneficiaries. It was held [7] that, inasmuch as the beneficiaries did not own the stock upon which the dividends were declared, *Eisner* v. *Macomber* was "not in point * * *" and "the value at the date of distribution should be included in the income of the beneficiaries." It was further held that "from the standpoint of the trustee, capital and not income of the estate was distributed to the beneficiary within the meaning of

[6] T. D. 3052, C. B. 3, p. 38; T. D. 3059, *idem.*
[7] I. T. 1506 and 1507, C. B. 1–2, pp. 163, 164.

*Eisner* v. *Macomber* * * *." Shortly thereafter, in 1923, the rulings were reconsidered.[8] It was pointed out that under section 219 (d) of the Revenue Act of 1921 and the corresponding section of the 1918 Act only "income which is to be distributed to the beneficiaries" is to be taxed and, "since under the doctrine laid down in *Eisner* v. *Macomber* a stock dividend is not income in the hands of the trustee, it cannot be considered income when distributed by the trustee to the beneficiaries." Congress having added, in the 1921 Act, a provision making the basis of property acquired by gift on or before December 31, 1920, its fair market value at the time of acquisition, it was stated in the ruling that the basis for determining gain or loss, by the beneficiary, of dividend stock received from a trust prior to January 1, 1921, was the fair market value of the dividend stock at the time of its receipt. It was said, "This rule applies whether the trust from which the beneficiary received the dividend stock was a testamentary trust or a trust created by conveyance *inter vivos*. This rule will also govern in the case of testamentary trusts, whether the stock dividend was received by the beneficiary before or after January 1, 1921."

Petitioner relies upon the language quoted above, construing it as a holding, which continued until revoked in 1939, that dividend stock received by a beneficiary at any time before the date of G. C. M. 21532, 1939—2 C. B. 231 and I. T. 3318, 1939—2 C. B. 232, had a basis in the hands of the income beneficiary of fair market value when received. Before considering his main argument, it is desirable to ascertain whether the postulate upon which it is partially rested is sound.

The Commissioner in drafting his 1939 ruling seems to have fallen into what, we think, is the same error now made by petitioner. Therein he quotes the paragraph from his 1923 ruling, which we have quoted above, and says it "is incorrect in providing that in the case of testamentary trusts, whether the stock dividend was received by the beneficiary before or after January 1, 1921, the basis for determining gain or loss upon the sale of such stock is the fair market value of the stock at the time of its receipt." He expresses the opinion that the question is governed by section 113 (a) (5) of the Revenue Act of 1934 as interpreted by article 113 (a) (5)–1 of Regulations 86, that the basis of the shares in the hands of the trustee is to be determined by allocating to it the pro rata part of the original stock prescribed by section 113 (a) (5) or section 113 (a) (14) of the Revenue Act of 1934, and that the shares distributed to the beneficiaries retain the same basis which they had in the hands of the trustee prior to their distribution.

The error made by the Commissioner in 1939, and by petitioner in assuming that the basis of the stock in the hands of his mother was fair market value when received, obviously stems from separating a para-

[8] I. T. 1662, C. B. II–1, p. 135, 137.

graph of the 1923 ruling from its context. The ruling, as has been pointed out above, had been made for the express purpose of superseding the 1922 ruling under which stock dividends distributed to the income beneficiaries were held to be taxable to the beneficiaries. Three questions were considered in the 1923 ruling: Were the dividends taxable income to the beneficiaries; what was the basis of the stock in their hands; and what was the basis of the shares remaining in the hands of the fiduciary. The first was answered in the negative. The essence of the answers to the other two was that the basis—cost in the case of an *inter vivos* trust and fair market value at the date of death in the case of a testamentary trust—should be allocated proportionately between the shares distributed and the shares retained. It is highly improbable that the Commissioner, having held that such dividends were not taxable to the beneficiary and that the basis for the shares should be allocated between those held by the beneficiary and those held by the fiduciary, should nevertheless hold that the basis of the stock distributed to the beneficiary should be fair market value at the time of its receipt. While the language is inept, we are of the opinion that the Department was merely attemping to be consistent. Having ruled that stock dividends received by the beneficiary of a trust prior to January 1, 1921, were to be included in gross income at their fair market value when received, it was but natural (and fair) to state that they should have the same basis for determining gain or loss. Having made a similar holding as to dividends distributed by testamentary trusts, it was also natural that it should be stated "this rule will also govern in the case of testamentary trusts." The addition of the clause "whether the stock dividend was received by the beneficiary before or after January 1, 1921" injects ambiguity into the sentence; but it is reasonable to assume that the Department was merely extending the rule to instances in which distributions had already been made. In that view a clear and consistent treatment of stock dividends emerges and the 1939 ruling was superfluous.

Since the rulings are not binding upon us, it is unnecessary to continue this discussion. They are of interest, however, as indicating the struggle which the Treasury Department has made to evolve a fair and practical rule for treating stock dividend stock. Congress has never specifically dealt with the basis for such stock in the hands of the distributee. The nearest it has come to doing so is in the enactment of section 214 of the Revenue Act of 1939, which became section 113 (a) (19), I. R. C. This section will be discussed later. The basis of the stock now in issue must therefore be determined under the statutes dealing with property in general as interpreted by the appropriate regulations and Treasury decisions.

The basic theory of the 1923 ruling has been applied by this tribunal. Thus in *Theodore W. Case et al., Trustees*, 26 B. T. A. 1044,

some of the stock dividends received by trustees of a testamentary trust were distributed, pursuant to an order of a New York surrogate, to the life beneficiary of a trust. The issue was whether the Commissioner had erred in computing the profit derived by the trustees from the sale of some of the stock remaining in their hands by apportioning the original basis between the old and new stock, reducing the total basis by the amounts allocable to the shares distributed to the life beneficiary, and apportioning the remainder between the then old stock and the new stock subsequently received as stock dividends. We held that no error had been committed. Cf. *May Rogers*, 31 B. T. A. 994, 1005; affirmed in part and reversed in part *per curiam* (C. C. A., 2d Cir.), *Rogers* v. *Helvering*, 107 Fed. (2d) 394, the reversal not being upon the point for which the case is now cited.

*Theodore W. Case et al., Trustees, supra,* which, so far as we have been able to ascertain, has never been reversed, overruled, or criticized, indicates that the alternative, suggested by both parties but espoused by neither, may be the correct method for determining the basis of the stock in the hands of petitioner's donor. Before deciding whether it is, we shall consider the arguments of the parties in support of their respective contentions.

Respondent attempts to support his determination of a zero basis by substantially the following line of reasoning: The mother received and was entitled to receive the income of her husband's residuary estate regardless of whether it was taxable or nontaxable income. For Federal income tax purposes the shares did not constitute taxable income either to the estate or to the life beneficiary. Property or money distributed by a fiduciary to the life tenant retains its status, for Federal income tax purposes, as taxable income or as exempt income, as the case may be, when received by the life tenant. Even though the shares were income to the recipient, inasmuch as they were not *taxable* income to her or included in her gross income,[9] they have no basis— i. e., they have a zero basis, since that was their cost—in her hands. No estoppel is pleaded.

Petitioner contends that, inasmuch as the shares had been apportioned and delivered to his mother under the laws of the state of her domicile, she having only the right to receive the income, they were taxable to her "as income, just as any cash distribution of trust income is so taxable"; that it is "unimportant" they may have been of a character exempt from tax in the hands of the estate; that even though they may not have been taxable income to the estate under

---

[9] The stipulation does not disclose whether the mother included either block of stock (the 66 shares or the 1,740 shares) in her returns of income for 1917 and 1922. Upon brief petitioner states it may be assumed for present purposes that she did not.

*Eisner* v. *Macomber*, "they had no constitutional immunity from tax" in his mother's hands when distributed to her; that the Treasury Department in its 1923 ruling, unrevoked until 1939, had specifically assigned to such stock a basis of fair market value when received; and that this was the true basis of the shares in her hands.

The argument of the respondent is bottomed largely upon *Koshland* v. *Helvering*, 298 U. S. 441, *Helvering* v. *Gowran*, 302 U. S. 238, and *Estate of H. H. Timken*, 47 B. T. A. 494; affd., *Commissioner* v. *Timken*, 141 Fed. (2d) 625. In the latter case it was held that stock received by the decedent in 1914 which, under *Peabody* v. *Eisner*, 247 U. S. 347, subsequently decided, should have been included in gross income but had not been because the recipient honestly believed, relying upon the advice of counsel, it was not taxable, had a basis of zero. Decision was rested squarely upon the fact that the record "was devoid of any proof that the decedent ever paid anything for the shares." No estoppel was pleaded or discussed, the Commissioner merely contending that the basis of the stock was cost. In the *Koshland* case the Supreme Court held invalid the portion of the regulations requiring an allocation of the original cost between preferred stock purchased and common stock received as a dividend. The next year it held in the *Gowran* case that even though a stock dividend, having substantially the same attributes as that involved in the *Koshland* case, may not have been taxable when received, nevertheless the excess of the amount realized over the cost of the property to the taxpayer, the cost being zero, was taxable.

Respondent construes the three cases as laying down a rule, applicable in all stock dividend cases, that stock dividend shares which constitute nontaxable income to the recipient always take a basis in his hands of zero. We do not agree. The question now before us was not raised or decided in any of the cases. Moreover, the Commissioner, at least since 1934—and the regulation was not changed after the *Koshland* and *Gowran* decisions—has always interpreted section 113 (a) (5) as providing a uniform basis rule, applicable to all property passing from a decedent, which, he says, is always the same "In the hands of every person who acquires  *  *  *  [it] or any estate or interest therein by bequest, or devise, or inheritance,  *  *  * whether such person be the executor or administrator, the heir, the legatee, the trustee of a trust created by the will, or any beneficiary of such trust, and whatever the nature of any such person's interest or estate may be." [10] Consistent with that interpretation the regulations also provide for adjustments to the basis for depreciation, depletion

---

[10] Art. 113 (a) (5)–1, Regulations 86, 94, and 101; sec. 29.113 (a) (5)–1, Regulations 103 and 111.

etc., and state: "adjustments in respect of capital expenditures or losses, tax-free distributions, or other distributions applicable in reduction of basis, or other items for which the basis is adjustable are made without regard to which one of the persons to whom the same uniform basis is applicable makes the capital expenditures or sustains the capital losses, or to whom the tax-free or other distributions are made, or to whom the deductions are allowed or allowable." [10]  We have recognized the underlying principle of this regulation—that the basis attaches to the *property*—in such cases as *William H. Slack, Jr.*, 36 B. T. A. 105 (appeal dismissed, C. C. A., 5th Cir.), and *Richard J. Reynolds*, 41 B. T. A. 59; affd., *Helvering* v. *Reynolds*, 313 U. S. 428.

Whether it may be said that petitioner's mother received the stock "by bequest, devise, or inheritance" is questionable.  *Irwin* v. *Gavit*, 268 U. S. 161.  It is clear, however, that she received it under her husband's will.  It is equally clear that from the standpoint of the estate, applying the rationale of *Eisner* v. *Macomber*, there was a mere proliferation of capital.  If the estate had sold any of the stock the gain or loss would have been computed by allocating the basis between the shares sold and those remaining.  If the estate had made a gift of the shares—assuming it had the power to do so—the basis of the shares in the hands of the donee would have been the same as the basis of the shares in the hands of the estate.[11]  It would be a strange result and wholly at variance with all of the published rulings of the Treasury Department if property which represented capital and had a basis in the hands of the executors lost that basis upon distribution to the one the testator designated to receive it.  Nor are we persuaded to adopt a different view by respondent's argument that all of the basis should be allocated to the shares ultimately to be distributed to the remaindermen.  The regulations in effect when that event occurred under the present facts (1938) though not specifically mentioning stock dividend stock, provide for an allocation of the basis between the life tenant and the remainderman.  Thus in the illustration which is given in subdivision (f) of article 113 (a) (5)–1 of Regulations 101 it is said that upon a sale by the remainderman, prior to the death of the life tenant, gain "is computed by comparing the amount of the proceeds received from the sale with the amount of the part of the uniform basis assignable to such sale of  *  *  *  [the] remainder interest.  The part of the uniform basis assignable to such sale  *  *  *  is the part of the uniform basis (adjusted to the time of the sale) of the land transmitted from the decedent which bears the same proportion to such uniform basis as  *  *  *  [the]

[10] See footnote 10, p. 117.
[11] Sec. 202 (a) (2), Revenue Act of 1921; sec. 204 (a) (2), Revenue Act of 1924, 1926; sec. 113 (a) (2), Revenue Act of 1928 and later acts.

remainder interest, at the time of the sale, bears to the whole estate in the land transmitted from the decedent."

While land is the type of property referred to in the illustration above, it is reasonable to assume that the same rule should be applied to any kind of property. Inferentially, the regulations justify such assumption; for they are to be applied to "property generally" except stock in a foreign personal holding company, as to which both the statute and the regulations lay down "a special rule." Thus it seems we would not be justified in sustaining respondent's contention that the stock had a basis of zero in the hands of petitioner's donor.

Is petitioner upon firm ground in insisting that the basis of the stock was fair market value when received? His chief reliance is placed upon *Plunkett* v. *Commissioner*, 118 Fed. (2d) 644, affirming *Theodore R. Plunkett*, 41 B. T. A. 700, and *Johnston* v. *Commissioner*, affirming *Robert W. Johnston*, 1 T. C. 228. On the question arising from failure of his donor to include the dividends in her taxable income for the years in which they were received, he relies upon *Bennet* v. *Helvering*, 137 Fed. (2d) 537; *Helvering* v. *Salvage*, 297 U. S. 106; *Countway* v. *Commissioner*, 127 Fed. (2d) 69, reversing *Francis A. Countway*, 44 B. T. A. 921; and *Commissioner* v. *Saltonstall*, 124 Fed. (2d) 110.

In the *Plunkett* and *Johnston* cases the basic question in each was whether, under the facts, any income had been realized by life beneficiaries under trusts and, if so, whether it was taxable to the estate or to the fiduciary. In the former the state court had determined that a portion ($70,000) of the amount replaced in the trust ($500,000) by a trustee who had breached the trust should be paid over to the beneficiary as income. We held that the $70,000 constituted income to the beneficiary which was to be distributed currently by the fiduciary (sec. 162 (b), Revenue Act of 1934) and the Circuit Court of Appeals for the First Circuit affirmed. In the latter the trustee of a trust, established by the taxpayers' mother for their benefit, had sold real estate belonging to the trust, taking back a bond. Default occurred, the mortgage was foreclosed, and the property was bid in for the face amount of the bond. Subsequently it was sold for a lesser amount. A portion of the sale price, being the proportion that the unpaid interest bore to the debt, was distributed to the life beneficiaries. The Circuit Court of Appeals for the Second Circuit affirmed our holding that the amounts received by the life beneficiaries were income currently distributable under section 162 (b).

The cited cases in our judgment have no pertinency to the question now before us. The present issue is not whether the receipt of the stock by the mother constituted income to her under the laws of the

state of her domicile, nor whether it was taxable to her under the Federal income tax laws. It is: What was the basis of the stock in her hands? Petitioner, it seems, would have the basis depend upon a ruling of the Department—not a regulation or a Treasury decision. Administrative rulings have no such effect. Cf. *Sanford's Estate* v. *Commissioner*, 308 U. S. 39; *Helvering* v. *Reynolds, supra.* Moreover the 1922 ruling, which, as pointed out above, was the only one which can be construed to have provided for a basis of fair market value at the time of receipt, was obviously not relied upon by petitioner's mother; for the stock received by her in December of that year was not included in her gross income. No ruling has been called to our attention or found which specified that the stock received by petitioner's mother in 1917 should be included in gross income at fair market value and take that as a basis. It, likewise, was not included in gross income. Thus under the present facts the most that can be said is that there was extant, at the time of the receipt of one block of stock, a ruling (not complied with and shortly thereafter rescinded) providing that the shares received be included in gross income at fair market value and take that as a basis.

In the view which we take, that petitioner's mother was not required by any statute or regulation to include the shares of stock in gross income, the other cases cited by petitioner become irrelevant. They apply the principle that the privilege of deducting a loss through stock becoming worthless is not "a correlative of the payment of a tax upon income when originally received."

The amendment to the statute, made by the addition of section 214 of the Revenue Act of 1939, which became section 113 (a) (19), I. R. C., is discussed by the parties upon brief. The decisions in the *Koshland* and *Gowran* cases (in the language of the Committee on Ways and Means)[12] had caused great confusion "with respect to the basis for computing gain or loss upon the sale of stock or stock rights acquired in nontaxable distributions." In an attempt to afford relief from "gross inequities for taxpayers and the Government alike" the section was enacted. It was "designed to afford a clear and unequivocal statutory basis, with respect to both past and future years, for the rule of allocation upon which taxpayers, the Treasury Department, and Congress have alike relied." The general scheme, as outlined in the reports of the committees, was to allocate, between the stock "acquired by the taxpayer after February 28, 1913" and "the stock in respect of which such distribution was made," the adjusted basis of the old stock "in all cases in which the new stock was acquired in a taxable year beginning before January 1, 1936," with exceptions not here important.

---

[12] Report No. 855, 76th Cong., 1st sess.

Respondent argues that the statute has no application here, since the stock was not received by petitioner's mother "as a shareholder." The question, in our judgment, may be passed. The "rule of allocation upon which taxpayers, the Treasury Department, and Congress have alike relied," in so far as it pertained to stock dividends of common upon common, was well established. *Helvering* v. *Wilshire Oil Co.*, 308 U. S. 90; *Helvering* v. *Griffiths*, 318 U. S. 371. Congress was aware of that when it undertook to abrogate, by statute, the rule of the *Gowran* case. It did so "by allocating between the old stock and the new the adjusted basis of the old." It is unthinkable that Congress intended to provide a more favorable treatment of taxpayers who had received stock taxable under the *Koshland* and *Gowran* decisions than it granted to those who had received stock which was not taxable under *Eisner* v. *Macomber*. We find no such preference merely in the failure to deal with the latter class in the statute designed to grant relief to the former.

In our judgment the basis of the stock in the mother's hands, at the time of the gift to petitioner in 1929, was as computed by the parties and shown in the schedule above as the "alternative" basis. Since it is lower than the fair market value of the property at the time of the gift, it must be used for computing gain or loss to petitioner. Sec. 113 (a) (2), I. R. C., *supra*.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

SMITH and ARUNDELL, *JJ.*, dissent.