ANTHONY J. DREXEL BIDDLE, JR., AND MARGARET T. BIDDLE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9526. Promulgated November 30, 1948.

*Joseph B. Lynch, Esq.*, and *Lawrence X. Cusack, Esq.*, for the petitioners.

*Conway N. Kitchen, Esq.*, for the respondent.

ARUNDELL, *Judge*: This proceeding involves an income tax deficiency of $135,097.15 for the taxable year ended December 31, 1937, the amount in controversy being approximately $128,716.38.

Two issues are presented for our determination. The first concerns the question of whether a dividend consisting of stock, which was received by the trustees of a testamentary trust, was properly allocated to the trust corpus and taxable to the trust, or constituted currently distributable income taxable to the income beneficiary, Margaret T. Biddle, within the meaning of section 162 (b) of the Revenue Act of 1936.

The second question relates to the taxability of Mrs. Biddle under the provisions of sections 22 (a) and 167 of the Revenue Act of 1936 upon income derived in 1937 from a trust established by her on July 26, 1935, in which her husband and two minor children were designated as beneficiaries.

### FINDINGS OF FACT.

Petitioners Anthony J. Drexel Biddle, Jr., and Margaret T. Biddle filed a joint income tax return for the calendar year 1937 with the collector of internal revenue for the second district of New York.

Petitioner Margaret T. Biddle, formerly Margaret Schulze, is the daughter and only child of the late William Boyce Thompson. She will hereinafter sometimes be referred to as the petitioner.

William Boyce Thompson, of the city of Yonkers, Westchester County, New York, died on June 27, 1930, leaving a will dated January 24, 1930, and a codicil thereto dated March 1, 1930, which were duly proved and admitted to probate by the Surrogate's Court of Westchester County by decree dated July 15, 1930.

In article first of the said codicil, the decedent revoked article eleventh of his will and bequeathed to his trustees, Thomas W. Lamont, Fred Searls, Jr., Thomas D. Thacher, and Percy Bullard, one-half of the residue of his estate:

IN TRUST, to invest and reinvest the same and receive the income therefrom and to pay over the net income thereof to my said daughter during her life, and at her death to pay the net income thereof to my said wife during her life, and at her death to transfer the same absolutely in equal shares per stirpes to the issue of my said daughter then living * * *.

This trust is hereinafter referred to as the codicil trust.

Article thirteenth of Thompson's last will and testament provided in part as follows:

In setting up any of the trust estates in this will provided for and in distributing the same, my said executors and also my trustees may use any securities or other property at that time held by them, and for that purpose may value and appraise any such securities and property, such valuation or appraisal to be conclusive against all persons interested in my estate. I further authorize and empower my trustees to determine any question which may arise as to what constitutes income or principal as between the interest of any life tenant and any remaindermen, and the decision of such trustees shall be conclusive against all persons interested in my estate; provided, however, that in making such determination any regular or ordinary quarterly, semi-annual or annual dividend, which may be payable in whole or in part in the stock of the corporation or association declaring or authorizing such dividend and which shall be declared in respect of any stock of such corporation composing in whole or in part the principal of any trust created hereby, shall be deemed to be income notwithstanding any provision of law to the contrary.

At the time of his death William Boyce Thompson owned 31,821 shares of stock of Newmont Mining Corporation of the par value of $10 per share. In 1932 the executors of the estate of Thompson delivered to themselves as trustees of the codicil trust 15,911 of the 31,821 shares of stock of Newmont. The 15,911 shares remained as part of the corpus of the trust beyond December 31, 1937.

The Newmont Mining Corporation was organized under the laws of the State of Delaware in 1921. Its principal office is at 14 Wall Street, New York City, and its principal business is the exploration, development, and financing of mining properties. The outstanding capital stock of the Newmont Mining Corporation in 1937 consisted of 531,646 shares of common stock with a par value of $10 per share.

Prior to June 27, 1930, Newmont Mining Corporation acquired certain shares of stock of the Calumet & Arizona Mining Co. and on October 19, 1931, these shares were exchanged for shares of stock of the Phelps Dodge Corporation. On November 16, 1937, the board of directors of Newmont, at a meeting duly called and held, adopted a resolution which read in part as follows:

RESOLVED, That there be and hereby is declared from Earned Surplus a dividend in the amount of 75 cents per share in cash and also a year-end dividend at the rate of one-tenth of a share of common stock of Phelps Dodge Corporation, upon each share of the capital stock of Newmont Mining Corporation issued and outstanding on November 30, 1937, exclusive of treasury stock, payable in cash and in shares of said Phelps Dodge Corporation capital stock, on December 15, 1937, to the holders of record of such outstanding stock of Newmont Mining Corporation at the close of business, to wit, at the hour of three o'clock in the afternoon on November 30, 1937, * * *.

It further provided that no fractions of shares were to be distributed, but in lieu thereof cash would be paid to each stockholder entitled to receive a fractional share.

The dividend so declared in shares of stock of Phelps Dodge was paid through the delivery by Newmont to the Bankers Trust Co., its dividend disbursing agent, of 52,704 shares of that stock.

On December 15, 1937, there were distributed to the trustees of the codicil trust, as the holder of 15,911 shares of Newmont stock, 1,591 shares of Phelps Dodge common stock, the fair market value of which on that date was $41,664.31, which constituted a taxable dividend in 1937.

Fred Searls, Jr., one of the trustees, was of the opinion that the 1,591 shares of Phelps Dodge stock received by the trust were distributable to the beneficiaries of the trust, and took preliminary steps to make such distribution by having his cotrustee, Thomas W. Lamont, sign a power of attorney in connection with the transfer. Thomas D. Thacher, another trustee, expressed his doubts as to whether such distribution could legally be made. Following a discussion of the three trustees (Percy Bullard, the fourth trustee having theretofore retired), Searls wrote to the attorneys for the trustees and requested their opinion. Upon the advice of counsel, the trustees determined that the aforesaid dividend constituted corpus of the trust and was not distributable income. Mrs. Biddle was informed of their decision by letter dated January 13, 1938.

The trustees of the codicil trust filed with the collector of internal revenue for the second New York district a fiduciary return for the calendar year 1937, in which the 1,591 shares of Phelps Dodge stock were valued at $26.1875 per share, or $41,664.31, and the latter amount was therein reported as income taxable to the trust.

The trustees' statement of account for the year 1937 showed, under

"Principal," securities held as at December 31, 1937. Included in such securities were the 1,591 shares of Phelps Dodge stock. It showed the total income for that year to be $148,128.34, of which $53,225.99 represented interest and $94,902.35 represented dividends. The dividend income of $94,902.35 reported by the trustees in this statement consisted of cash dividends and did not include any of the 1,591 shares of Phelps Dodge stock. Mrs. Biddle accepted and approved this statement of account for the year 1937.

The trustees filed an accounting of their proceedings in the Surrogate's Court of Westchester County for the period ended May 15, 1936, which was approved by decree of that court entered January 4, 1937. The occasion for the accounting was the retirement of one of the trustees. There has been no subsequent court accounting by the trustees.

During the period 1931 to 1938, the cash dividends paid by Newmont per share were as follows:

| | | | |
|---|---|---|---|
| 1931 | $2.00 | 1935 | $1.50 |
| 1932 | _____ | 1936 | 3.75 |
| 1933 | _____ | 1937 | 3.00 |
| 1934 | 1.00 | 1938 | 3.00 |

During the same period, Newmont paid no stock dividends and no dividends in shares of other corporations except those of the Phelps Dodge Corporation and made no distribution to shareholders of rights to subscribe. As at December 31, 1937, the assets of the Newmont Mining Corporation amounted to $48,524,570.40 and consisted chiefly of cash totaling $3,286,131.13, listed securities amounting to $37,775,163.01 (based on market quotations on December 31, 1937), and miscellaneous stocks, loans, and other undertakings amounting to $7,309,971.98 (based on their fair value on December 31, 1937). The liabilities as at December 31, 1937, (exclusive of capital stock and surplus) consisted of accounts payable and accrued taxes amounting to $53,235.88 and estimated 1937 Federal income tax of $107,757.21. The December 31, 1937, balance sheet of Newmont showed an earned surplus of $35,509,680.31.

The profit and loss statement of Newmont for the year ended December 31, 1937, showed total income and profits of $4,504,456.88, of which $3,188,708.01 represented cash dividends, $1,200,714.69 represented profits on sales of capital assets, and the balance represented interest and fees. The statement showed total expenses and losses of $1,529,919.29, of which $405,094.96 represented exploration expenses on ventures abandoned, $423,728.70 represented other expenses, and $701,095.63 represented losses on sales of capital assets. The statement showed net income of $2,974,537.59 for the year before provision for Federal income taxes and net income of $2,867,841.19 for

the year after such provision. The income derived by the corporation from dividends received in 1936 and 1937 was $2,427,520 and $3,188,708.01, respectively, or a net increase in dividend income of $761,188.01. The earned surplus account of Newmont for the year ended December 31, 1937, showed a balance as at January 1, 1937, of $35,792,794.12, a net income for the year of $2,867,841.19, dividend distributions during the year of $3,150,955 (of which $1,594,938 represented cash dividends, $1,544,214.13 represented the book value of 52,704 shares of Phelps Dodge stock distributed, and $11,802.87 represented cash distributed in lieu of Phelps Dodge fractional shares) and a balance as at December 31, 1937, of $35,509,680.31.

The deficiency notice received by the petitioners in the present case stated in part as follows:

It is held that the dividend paid to the trustees of a trust under the will of William Boyce Thompson for the benefit of Margaret T. Biddle by the Newmont Mining Company in the stock of the Phelps Dodge Corporation, constitutes gross income taxable to Mrs. Biddle  *  *  *

#### OPINION.

This issue presents the question as to whether the dividend of 1,591 shares of Phelps Dodge stock received in 1937 by the trustees of the codicil trust from the Newmont Mining Corporation was properly allocated by them to trust corpus or, as contended by respondent, constituted currently distributable income taxable to the beneficiary Margaret T. Biddle.

The test of the petitioner's taxability upon the undistributed dividend is her present right to receive it, Bedford v. Commissioner, 150 Fed. (2d) 341; Plimpton v. Commissioner, 135 Fed. (2d) 482; Malcolm v. Commissioner, 97 Fed. (2d) 381; DeBrabant v. Commissioner, 90 Fed. (2d) 433. In situations where a state court has not construed the trust instrument, a Federal court must determine the rights of the parties under the applicable state law as best it may. Bedford v. Commissioner, supra; Helvering v. Stuart, 317 U. S. 154; Commissioner v. Lewis, 141 Fed. (2d) 221. In Helvering v. Stuart, supra, the Supreme Court explained the relation of state law applicable to rights arising under deeds, wills, and trusts to the Federal taxability of such interests as follows:

*  *  *  When Congress fixes a tax on the possibility of the revesting of property or the distribution of income, the "necessary implication", we think, is that the possibility is to be determined by the state law. Grantees under deeds, wills and trusts, alike, take according to the rule of the state law. The power to transfer or distribute assets of a trust is essentially a matter of local law. Blair v. Commissioner, 300 U. S. 5; Freuler v. Helvering, 291 U. S. 35. Congress has selected an event, that is the receipt or distributions of trust funds by or to a grantor, normally brought about by local law, and has directed a tax

to be levied if that event may occur. Whether that event may or may not occur depends upon the interpretation placed upon the terms of the instrument by state law. Once rights are obtained by local law, whatever they may be called, these rights are subject to the federal definition of taxability.

Cf. *Morgan* v. *Commissioner*, 309 U. S. 78; *Lyeth* v. *Hoey*, 305 U. S. 188.

It is the duty of this Court to give effect to an intention of the testator as expressed in his will if such is consistent with law. *Smith* v. *Bell*, 6 Pet. 68. The courts of New York have consistently adhered to the proposition that it is the intent of the testator as expressed in his will and reasonably interpreted that determines the propriety of allocations as between principal and income in the absence of a mandatory legislative declaration or a settled rule of law. *Chase National Bank* v. *Chicago Title & Trust Co.*, 271 N. Y. 602; 3 N. E. (2d) 205; *In re Hagen's Will*, 237 App. Div. 476; 261 N. Y. S. 437; *Equitable Trust Co. of New York* v. *Prentice*, 250 N. Y. 1; 164 N. E. 723.

Article thirteenth of Thompson's will initially authorized and empowered the trustees to determine any question which might arise as to what constituted income or principal between the interests of any life tenant and any remainderman, and provided that the decision of such trustees should be conclusive against all persons interested in his estate. The courts of New York have held that in construing such a clause it can not be assumed that the testator by this general authorization intended to violate any of the settled rules of law, but only intended to authorize them to come to a conclusion in matters of doubt, and that their determination upon any question about which there could be a reasonable doubt, arrived at genuinely and not arbitrarily, would be binding upon all persons interested. *In re Talbot's Will*, 170 Misc. N. Y. 138; 9 N. Y. S. (2d) 806.

From this grant of discretionary power the testator carved an exception which reads as follows:

* * * provided, however, that in making such determination any regular or ordinary quarterly, semi-annual or annual dividend, which may be payable in whole or in part in the stock of the corporation or association declaring or authorizing such dividend and which shall be declared in respect of any stock of such corporation composing in whole or in part the principal of any trust created hereby, shall be deemed to be income notwithstanding any provision of law to the contrary.

It is respondent's contention that the above quoted exception is broad enough not only to cover stock dividends, but also dividends in kind, and consequently the Phelps Dodge shares, by the terms of the proviso, were distributable to petitioner and the trustees had no discretion in the matter. With this we can not agree.

It is interesting to note that the particular language used in the exception is almost identical with that in section 17 (a) of the New

York Personal Property Law,[1] which provides that the stock dividends received by a trust are to be added to principal unless otherwise provided for in the trust instrument. It would seem to us that the proviso in Thompson's will was drafted in the light of this section of the New York law and was designed specifically to take advantage of the privilege offered therein to determine the allocation of stock dividends. The language of section 17 (a) has been held to refer only to stock dividends. A stock dividend has been defined as one payable in the stock of the corporation declaring or authorizing such dividend, and a dividend of stock in another corporation has been held to be the same as a cash dividend. *In re Villard's Will*, 176 Misc. 852; 29 N. Y. S. (2d) 323. The fact that the language of section 17 (a), which was adopted almost verbatim by the testator, refers only to stock dividends and not to dividends declared in the stock of other corporations, is supported by the last sentence of section 17 (a) which reads: "The addition of any such stock dividend to the principal of such trust, as above provided, shall not be deemed an accumulation * * *."

We think the literal language of the proviso likewise makes untenable respondent's argument that the exception applies as well to dividends in kind as to stock dividends. He argues that the clause "and which shall be declared in respect of any stock of such corporation composing in whole or in part the principal of any trust created hereby * * *," is broad enough to cover dividends in kind. But we think his argument overlooks the fact that this clause must be read in connection with the preceding one, which describes the dividends to be excluded from the trustees' discretion as those "which may be payable in whole or in part in the stock of the corporation or association declaring or authorizing such dividend." When so read, the disputed clause clearly serves only to identify and define the testator's limitation to "stock dividends" declared by corporations in stock composing the whole or a part of the various stocks established by him in his last will and testament. To separate the clause of the proviso relied on by respondent from the former clause we have quoted, makes it read, in effect, "dividends which shall be declared in respect of any stock of such corporation * * * shall be deemed to be income * * *." Such a reading of article thirteenth would make it mandatory upon the

---

[1] 17-a. *Stock dividends.*

Unless otherwise provided in a will, deed or other instrument, which shall hereafter be executed and shall create or declare a trust, any dividend which shall be payable in the stock of the corporation or association declaring or authorizing such dividend and which shall be declared or authorized hereafter in respect of any stock of such corporation composing, in whole or in part, the principal of such trust, shall be principal and not income of such trust. The addition of any such stock dividend to the principal of such trust, as above provided, shall not be deemed an accumulation of income within the meaning of this article.

trustees to distribute all dividends as income. This was clearly not the testator's intention.

It is our opinion that respondent's construction of the exception found in article thirteenth of Thompson's will is incorrect.

After a careful study of the matter, we are convinced that article thirteenth does not restrict the trustees from determining the proper allocation of the Phelps Dodge stock, a dividend in kind, as income or principal. It was the testator's express intention that they should have this power to allocate and that their determination should be conclusive against all persons interested in his estate. As the trustees were empowered in a case involving "honest doubt" to determine the allocation of the dividend in question, their determination would not be disturbed by this Court if it was reached in the exercise of sound discretion. *Florence H. Thornton*, 5 T. C. 1177; *Doty v. Commissioner*, 148 Fed. (2d) 503. An examination of the New York law would indicate that the trustees in the instant case were reasonably within their granted authority and the laws of that state in allocating the dividend in question to principal and in not distributing it as income to Mrs. Biddle.

The New York law, as expressed in the decisions of its courts, holds that a dividend declared during the life interest in stock of another corporation, if it represents earnings and not capital assets, will be awarded to corpus, to income, or apportioned between the two, according to whether it was earned wholly before, wholly after, or partly before and partly after the commencement of the life interest. *Bourne v. Bourne*, 240 N. Y. 172; 148 N. E. 180; *In re Lavanburg's Estate*, 224 N. Y. S. 718; *United States Trust Co. v. Heye*, 224 N. Y. 242; 120 N. E. 645; *Matter of Megrue*, 224 N. Y. 284; 120 N. E. 651.

The respondent has suggested that had the Newmont Corporation sold all Calumet & Arizona shares for cash and distributed the proceeds instead of stock, it would have necessitated a different allocation. It may well be that the difficulties incident to the "earmarking" or "tracing" of a cash dividend under those circumstances would have been so great that a state court would have employed entirely different standards in reaching its decision. However, the obvious answer to such an argument is simply that whatever rule the state court might apply in that situation is of no significance under the state of facts before us. Secondly, the courts do not profess to have attained mathematical perfection or complete consistency in their treatment of this problem. On the contrary, in *Bourne v. Bourne, supra,* the court stated:

> Our main purpose has been to preserve intact the capital of the trust estate, increased or decreased by any normal rise or fall in values, assigning to the life tenant but the income therefrom. Our decisions have been an attempt to enforce this purpose. And we do not, as we could not, always apply any one formula.

The court therein recognized that apparent inconsistencies are apt to result in the application of the various rulings. Speaking of the rule governing the apportionment of the extraordinary cash dividends payable from surplus profits earned both before and after the trust estate was created, the court stated: "It is true that this solution of the problem does not accomplish our purpose with mathematical accuracy. It is at best but a rough approximation to justice."

Applying the New York rule, as we understand it, we find that the Calumet & Arizona Mining Co. stock was acquired by the Newmont Mining Corporation before the death of William Boyce Thompson on June 27, 1930, and the commencement of the interest of petitioner in the codicil trust established by his will. This stock was obviously purchased out of capital or from the earnings of the Newmont Corporation accumulated prior to June 27, 1930. The subsequent exchange of the Calumet & Arizona stock for the shares of Phelps Dodge stock did not alter the character of the property, i. e., the Phelps Dodge stock when acquired replaced the Calumet & Arizona stock. The 1,591 shares of Phelps Dodge stock distributed as a dividend by the Newmont Corporation on December 15, 1937, to the trustees of the codicil trust were, at the time of their distribution, a portion of the assets of the Newmont Corporation which had been acquired by it prior to the effective date of Thompson's will, and consequently under the New York rule could properly be awarded to trust corpus.

It is our opinion that article thirteenth of Thompson's will vested in the trustees discretion to allocate a dividend of this character as trust principal or as distributable income to the beneficiary. This discretion as ultimately exercised was not in conflict with New York law. It follows that the beneficiary, Margaret T. Biddle, possessed no present right to receive the dividend in question as income and, therefore, the value of such shares may not be taxed to her as currently distributable income under section 162 (b) of the Revenue Act of 1936.

### FINDINGS OF FACT.

On July 26, 1935, Margaret T. Biddle, as grantor, transferred to herself, Anthony J. Drexel Biddle, Jr., and Fred Searls, Jr., as trustees, certain securities to be held under a trust agreement bearing that date. Named as income life beneficiaries were the grantor's husband, Anthony J. Drexel Biddle, Jr., and her two children, Theodore Schulze, Jr., and Boyce Thompson Schulze. The trust instrument recited that certain securities were thereby assigned, transferred, paid over, and delivered to the trustees, and it reserved to the grantor the right to convey additional property from time to time to such trust.

The trustees were directed to hold the trust estate, to invest, reinvest and to keep the same invested, to collect and receive the income therefrom, and to hold and dispose of the net income and principal as follows:

1. * * * the TRUSTEES shall pay to or for the use and benefit, and for the maintenance, benefit, and welfare of each of the said beneficiaries one-third of the entire net income derived from the said Trust Estate. Payments shall be made at intervals convenient to the TRUSTEES. The TRUSTEES may, in their discretion use such portion of the principal of said Trust Estate as may from time to time in the opinion of the majority of them be necessary for the purposes hereinabove set forth.

Upon the death of any one of the three beneficiaries, the residue of the trust was to be divided into two equal shares in representation of each of the two surviving beneficiaries. The net income of each share was to be:

2. * * * paid to or applied for the use and benefit and for the maintenance, benefit, and welfare of the respective surviving Beneficiary at intervals convenient to the TRUSTEES.

Upon the death of either of such surviving beneficiaries, the entire corpus was to be paid over to the remaining survivor, but if none should be then living, to the issue of the grantor's said children in equal shares *per stirpes;* if there should be no such issue, the corpus was to revert to the grantor; if the grantor should be not then surviving, then unto her appointee under her last will and testament, or, in case of failure to appoint, to her personal estate had she died intestate a resident of the District of Columbia. The trustees were vested with discretionary power to:

3. * * * use such portion of the respective shares of said Trust Estate as may from time to time in the opinion of a majority of them be necessary or advisable to carry out the purposes of this Trust in respect of the Beneficiary in representation of whom said respective share is set apart.

It further provided that:

4. In all cases the decision of the TRUSTEES as to what shall constitute net income or principal and when application of any principal shall be made, shall be final and binding upon the GRANTOR and upon the respective Beneficiary affected thereby.

The trustees, among other things, were expressly authorized, although not required, to retain any and all securities and property transferred to them pursuant to the trust. They were authorized:

5. * * * to barter, sell, lend, exchange and/or pledge any part thereof, * * * to borrow money with or without security, and to add the same to the principal amount of the Trust Estate, * * * to buy, sell, purchase and exchange, and to deal and trade in stocks, bonds, choses in action and other investments upon margin, or upon credit, * * * to invest and re-invest the Trust Estate according to their judgment, without being restricted to such investments or transactions as a trustee is or may hereafter be permitted by law

to make. * * * in their discretion to consent to the merger, consolidation or dissolution of any corporation, the stock of which is held in trust hereunder. * * * to vote directly or by proxy in respect of any shares of stock at any time forming a portion of the Trust Estate with like effect as if held in their own right, and to take other action, or make or enter into any agreement with respect to any securities at any time held in trust hereunder, and in connection therewith to make any expenditure from the principal of the Trust Estate which the TRUSTEES or their successors may deem advisable.

The trust instrument provided as follows as to the liability of the trustees and their removal and substitution:

6. The TRUSTEES shall in no event be liable to any person for any loss resulting from any act or neglect of theirs in the absence of actual fraud or intent to personally profit thereby, and shall not be accountable for losses incurred by reason of speculative or hazardous investment of trust funds. * * *

7. Any TRUSTEE hereunder may resign from the Trust by written resignation delivered to the other TRUSTEES. Upon the resignation, death, or inability to act of any one of the TRUSTEES hereunder, the remaining TRUSTEES shall name a substitute TRUSTEE who shall in all respects succeed to the title, rights, and power of the TRUSTEE in whose place he is substituted. The TRUSTEES shall serve without compensation. The signature of one TRUSTEE shall be sufficient to bind the Trust in any and all matters. * * *

8. The GRANTOR may at any time remove any one or all of the TRUSTEES and appoint a successor or successors by an instrument in writing by the GRANTOR, delivered to the TRUSTEES.

The value of the trust when it was established was approximately $500,000.

The securities transferred by the grantor to the trustees on July 26, 1935, were as follows:

2,000 shares Newmont Mining Corporation.
6,800 shares Hudson Bay Mining & Smelting Co., Ltd.
3,000 shares Empire Star Mines Co., Ltd.

On August 5, 1935, the grantor transferred to the trustees the following additional securities:

2,000 shares Newmont Mining Corporation.
6,800 shares Hudson Bay Mining & Smelting Co., Ltd.
2,000 shares Empire Star Mines Co., Ltd.

On December 6, 1935, the grantor transferred to the trustees the following additional securities and cash:

200 shares Newmont Mining Corporation.
300 shares International Mining Corporation.
200 shares Empire Star Mines Co., Ltd.
6,000 shares United Verde Extension Mining Co.
$16,692.54 cash.

Fred Searls, Jr., a geologist by training and occupation, is president of the Newmont Mining Corporation, and is and has been a director of that corporation since 1926. Searls was a friend and business associate of William Boyce Thompson, the father of petitioner Mar-

garet T. Biddle, and was one of the executors under Thompson's last will and testament and a trustee of the codicil trust established therein. At the time of the creation of the trust Searls was, and he is at the present time, a resident of New York, with offices in New York City.

Searls is not related to the petitioners. He has been acquainted with Mrs. Biddle since some time after 1918, and since 1927, pursuant to a general power of attorney, he has handled a substantial amount of Mrs. Biddle's personal financial affairs and investments. Mrs. Biddle had great confidence in Searls and wanted him to take complete charge of the trust, but he desired other trustees. It was her intention, in reserving to herself in article 8 the power to remove and substitute trustees, that she might remove her husband should he attempt to interfere in trust management. Since the date of the trust creation there has been no change in trustees. Broad administrative powers were vested in the trustees by Mrs. Biddle in article 5, due to her observation of the conduct of trusts established by her father's will, wherein the trustees were hampered by limited powers.

A few days before July 26, 1935, Mrs. Biddle had made the decision to set up the trust. She was then in Washington, D. C. Anthony Biddle was entering the diplomatic service and thereby assuming new obligations which would necessitate added expense. Prior to her arrival in New York on July 26, 1935, she spoke to Searls regarding the establishment of such a trust and instructed her lawyer by telephone to prepare the necessary legal papers. On the same day that the trust instrument was executed in New York, Biddle and Mrs. Biddle and both children left the United States for Oslo, Norway, to which country Biddle had been appointed minister. It was because Mrs. Biddle realized that she and her husband would be abroad indefinitely that in article 7 of the trust agreement it was provided that the signature of one trustee would be sufficient to bind the trust in any and all matters. This permitted Searls to conduct trust affairs without the delay which would have resulted had he been required to secure the signatures of his cotrustees.

In addition to supplementing her husband's income, Mrs. Biddle's purpose in establishing the trust of July 26, 1935, was to train her children in the practical use of money and to bring them up with a sense of financial independence. Her son, Theodore Schulze, Jr., was at that time 16 years of age, and her daughter, Boyce Thompson Schulze, was 14. Mrs. Biddle's children were expected to inherit a considerable fortune from the estate of their grandfather, William Boyce Thompson, who died in 1930, leaving a gross estate in excess of $17,000,000. Prior to the establishment of this trust, Mrs. Biddle's children had practically no income of their own.

It was also Mrs. Biddle's desire that her son Theodore become interested in a mining career. Her father had founded the Newmont

Mining Corporation and Mrs. Biddle regarded herself as merely a stopgap until her son could carry on her father's mining interests. It was her hope that the relationship between Searls and her son might possibly lead the latter to take an interest in the business which his grandfather had left.

The trust securities conveyed by Mrs. Biddle to the trustees were transferred from her name to the name of Filor, Bullard & Smythe, brokers for the trust, in order to facilitate deliveries on the Exchange. The trust's bank account has been maintained at the Bankers Trust Co., New York.

Since the trust was created, Searls has been the only active trustee, having purchased and sold securities involving between $2,000,000 and $3,000,000 in connection with the administration of the trust. Except for the request for approval or comment on his annual statement and excepting also the single instance of a loan made by the trust to Theodore, Searls never consulted or sought the advice or counsel of either of his cotrustees. Searls never consulted his cotrustees with regard to the purchase and sale of securities. All of approximately 300 checks drawn on the trust bank account were signed by Searls. Searls and his brother have access to the safe deposit box at the Chase Safety Deposit Co. where the trust securities are kept. Searls has always had the key to this box. Almost 100 per cent of all trust transactions have been effected on the Stock Exchange and no trust assets were ever sold for less than they were worth. No trust assets were ever transferred to Mrs. Biddle or on her order. No principal of the trust has ever been distributed and no income has ever been accumulated. No loans were ever made by the trust to Mrs. Biddle or on her order. No loans were ever made to anyone with the exception of a loan of $140,000 to Theodore.

Theodore Schulze, Jr., borrowed $140,000 of trust funds to enable him to purchase 5,000 shares of stock of Empire Star Mines Co., Ltd. The trust, in evidence of the loan, took his demand note dated December 31, 1936, for that amount, bearing the unconditional guaranty of Mrs. Biddle as to both principal and interest, and was secured by the deposit of the above shares with the trust. In accordance with the terms of the note, this loan was reduced by the application of dividends received on the stock held as collateral and also by the application from time to time of 50 per cent of Theodore's distributable share of the trust income. The foregoing note, together with 3 per cent interest, was paid off from time to time during the years 1937, 1938, and 1939 and the balance of $2,733.95 was paid on March 15, 1940. The stock then held as collateral was delivered to Theodore Schulze, Jr. This loan of the trust to Theodore was made at the instance of Searls in order to further stimulate the former's interest in

the mining business and in mining securities, in accordance with his mother's desire.

With few exceptions, the income of the trust was distributed quarterly. The trust income payable to Anthony Biddle was distributed to him and checks representing trust income payable to Theodore and Boyce were mailed to the Bankers Trust Co. for deposit to the credit of their personal accounts. The arrangements for the opening of the accounts of Theodore and Boyce at the Bankers Trust Co. were made by Dorothy Gaess, the financial secretary of Mrs. Biddle, and a separate set of books was kept for Theodore and for Boyce. Once the trust distribution checks were forwarded to the bank for credit to their accounts, the trustees exercised no supervision over the funds distributed to the children. Mrs. Biddle has never at any time had a power of attorney over the bank accounts of Theodore or Boyce, nor had anyone prior to January 1, 1938.

The trustees never applied or were requested to apply any of the income or principal of the trust to the maintenance, benefit, and welfare of any of the beneficiaries. No restrictions were ever placed on the use of the income by any of the beneficiaries other than that of Theodore in connection with the repayment of the loan secured by him from the trust.

None of the trustees has ever voted any stock held by the trust. Whenever requests for proxies were received, Searls authorized Filor, Bullard & Smythe, in whose name the trust stock stood, to "give the management the proxies."

Anthony Biddle never took any part in the administration of the trust, never gave directions regarding the purchase and sale of securities by the trust, never purchased or sold any trust securities, was never consulted in advance regarding the purchase or sale of trust securities, never signed any checks on the trust bank accounts, never gave any directions regarding the distribution of trust income, did not have access to the safe deposit box of the trust, never borrowed anything from the trust, never voted or gave any directions or signed any proxies in connection with stocks held by the trust, and was not an officer or director of any company while securities of such company were held by the trust.

Margaret T. Biddle never took any part in the administration of the trust except that once a year she carefully examined the statement of transactions of the trust, approved the same, and returned it to Searls. She was consulted regarding the loan by the trust to Theodore. She never gave any directions regarding the purchase and sale of securities by the trust, never purchased securities from or sold securities to the trust, was never consulted by Searls concerning the purchase or sale of trust securities, never signed any checks on the trust bank account, never gave any directions regarding the

distribution of trust income, never deposited in or withdrew from the trust safe deposit box any securities, never borrowed any money from the trust, never voted or gave any instructions regarding the voting of stock held by the trust, and was not a director or officer of any corporation while the securities of that corporation were held by the trust.

Before the trust was set up, Mrs. Biddle had made Christmas, birthday, and anniversary gifts to her husband and to her children and after that time continued to make such gifts. In addition, she gave her daughter a home in Virginia and her son a house in Fontainebleau. Immediately before the trust was established, Mrs. Biddle paid for the maintenance of the children. She also paid for their maintenance after the trust was established. When the son and daughter used their own funds for school and other expenses, Mrs. Biddle reimbursed them. In the 1937 fiduciary return of the trust, each beneficiary's share of the taxable income was shown to be $31,241.

Theodore and Boyce Schulze were the children of Margaret T. Schulze (now Margaret T. Biddle) and Theodore Schulze, Sr. An agreement between Margaret T. Schulze and Theodore Schulze, dated June 22, 1926, recited that the parties were huband and wife and that the wife had instituted against the husband an action for divorce before the Civil Tribunal of the Department of the Seine at Paris, France. The agreement provided, among other things, that the husband should pay the costs of the support, maintenance, and education of each child during the portion of the year when they or either of them were in the custody of the wife. Margaret T. Schulze and Theodore Schulze were divorced by decree recorded July 15, 1926. This decree recognized the fact that the parties had reached an agreement as to the custody of the children and the right to visit them.

Mrs. Biddle was appointed guardian of the persons and property of Theodore, Jr., and Boyce by decrees of the Surrogate's Court of New York County dated June 25, 1931. Each of the decrees contains the following provision:

FURTHER ORDERED AND DECREED that said General Guardian be dispensed from executing any bond, but that it shall not be lawful for such General Guardian to take into her possession, as such General Guardian, any property, real or personal, assets, income or effects of said infant until the further Order of this Court.

The purpose of the appointment of Mrs. Biddle as guardian of the children was to comply with the provisions of a codicil to the will of William Boyce Thompson. Such codicil provided that if at the expiration of one year from his death either of his daughter's children should be minors and his daughter should be living and should not either (a) have been appointed sole guardian of such children, or (b) in the absence of such appointment have in fact exclusive control or

custody of such child, the principal of the trust funds established under his will would become payable absolutely to his daughter and his wife instead of becoming payable to the issue of his daughter upon the death of his wife and daughter.

There has never been any such further order of the Surrogate's Court. Mrs. Biddle has never taken possession of any property, real or personal, assets, income, or effects of Theodore or Boyce. Mrs. Biddle, as guardian, filed annual inventories and accounts with the Surrogate's Court, New York County, verified July 5, 1938, to that effect.

Theodore Schulze, Sr., who was engaged in the banking business, died on September 22, 1936, in New York City. At the date of his death he was about 47 or 48 years of age. The cause of his death was coronary thrombosis, and the contributory cause was hypertension. It was Mrs. Biddle's belief at the time of the execution of the trust in 1935 that Schulze was in good health.

Theodore, Jr., received in 1937 dividends in the amount of $40,059.50 from stock in the Empire Star Mines Co., Ltd., which stock was acquired by him during 1936. These dividends were included in his income tax return for the calendar year 1937 filed with the collector for the second district of New York, which return also included Theodore's income from the trust of $31,241. In the beginning of 1937 Theodore had in his own bank account the sum of $20,600.09. Boyce Schulze had on deposit in her own name $30,201.19 in the Bankers Trust Co. on January 2, 1937. A considerable amount of this money had been acquired by both of the children prior to the date of their father's death on September 22, 1936.

The deficiency notice in the present case reads as follows:

It is held that the income of the trust created on July 26, 1935 by Mrs. Biddle for the benefit of her two children and Mr. Biddle constitutes gross income to Mrs. Biddle within the purview of Section 22 (a) of the Revenue Act of 1936.

### OPINION.

This issue concerns the taxability of petitioner Margaret T. Biddle upon income derived in 1937 from a trust created by her on July 26, 1935, for the benefit of her husband and two minor children. It is the contention of the respondent that such income is taxable to her under section 22 (a) of the Revenue Act of 1936 and the doctrine of *Helvering* v. *Clifford*, 309 U. S. 331, or under the provisions of section 167 of the Revenue Act of 1936, and the rationale of *Helvering* v. *Stuart*, 317 U. S. 154.

The test of whether the settlor may under section 22 (a) be treated as the owner of the corpus after the trust has been established depends upon an analysis of the terms of the trust and all the circumstances attendant upon its creation and operation. No one fact is ordinarily

decisive. The grantor will only be taxed as the owner of the trust corpus when "the bundle of rights" retained by him is so substantial that the aggregate may be said to be a fair equivalent of what he previously had and that the establishment of the trust in fact effected no substantial change in his economic position. *Helvering* v. *Clifford, supra; United States* v. *Morss*, 159 Fed. (2d) 142.

It is respondent's contention that the powers which Mrs. Biddle could exercise over trust property even after the establishment of the trust "were so great that the result necessarily followed that Mrs. Biddle never relinquished dominion and control over the property which she in substance transferred to herself as sole trustee." This contention is based primarily upon the broad powers conferred on the trustees in the trust instrument and the power reserved by Mrs. Biddle to herself as grantor to "at any time remove any one or all of the trustees and appoint a successor or successors."

The facts surrounding the execution and administration of the trust point unequivocably to the conclusion that Fred Searls, Jr., was intended to be and in fact was the only active trustee. Experience had proved to the grantor that conferring unfettered authority upon Searls, in whom she had complete confidence, would be to the advantage of the beneficiaries. To insure Searls having complete control over trust management and freedom from interference, she reserved to herself the power to remove and substitute trustees. There is not the slightest inference in the record to indicate that this power was retained by her with a view to retaining control over the trust corpus.

The respondent argues that this power of substitution could have been ultimately employed by Mrs. Biddle for her own benefit. However, such a conclusion rests, first, upon the assumption that the subsequent trustees she might appoint would be less conscientious in the execution of their fiduciary duties than those she might remove. Secondly, if the power of substitution would permit Mrs. Biddle to succeed in establishing herself as the "sole trustee," a right which is at least doubtful in view of the language of articles 8 and 1, she could not thereby escape the obligations of fidelity and diligence that attach to the office of trustee and the duty to further the interests of the beneficiaries and not to deal with trust property to her own advantage. *Carrier* v. *Carrier*, 226 N. Y. 114; 123 N. E. 135; *Phipps* v. *Commissioner*, 137 Fed. (2d) 141; *Cushman* v. *Commissioner*, 153 Fed. (2d) 510.

The powers of management conferred on the trustees were broad and extensive and were necessarily made so in the interests of efficient management. Such powers were vested in the petitioner only in her capacity as one of the trustees and were not reserved by her as grantor. They are to be construed as fiduciary powers which must be exercised

in good faith for the benefit of the beneficiaries rather than for her own personal benefit or aggrandizement. *United States* v. *Morss, supra; Hall* v. *Commissioner,* 150 Fed. (2d) 304.

Mrs. Biddle, as grantor, endowed the trustees with extensive powers to provide Searls with full range of judgment and discretion in the conduct of trust affairs. She has stated that it was her intention that he should have complete charge of the trust management. The facts surrounding the actual operation of the trust substantiate this purpose. Searls was the only active trustee, he signed all the checks, and he never, save in one instance, consulted or sought the advice of either of his cotrustees concerning trust investments. Neither Biddle nor Mrs. Biddle has ever taken any part in the administration of the trust, nor has either ever given any directions or instructions regarding the purchase or sale of trust securities. They did not have access to the safe deposit box of the trust, never borrowed from the trust, never voted or gave directions as to the voting of stocks held by the trust, and were not officers or directors of any company whose securities were held by the trust.

The respondent further submits that under the terms of the trust instrument it was possible for Mrs. Biddle to invade the corpus and "sprinkle" it among the beneficiaries, as was the case in *Commissioner* v. *Buck,* 120 Fed. (2d) 775. Respondent's conclusion to this effect is based upon, first, the assumption that Mrs. Biddle's power to remove and substitute trustees made her, for all practical purposes, the sole trustee. Such a conclusion can not be drawn in the light of article 1, which gives the power to distribute a portion of the principal of the trust from time to time when in the opinion of a majority of the trustees it is necessary for the maintenance, benefit, and welfare of the beneficiaries. This authority to invade trust corpus is not one which is conferred solely on Mrs. Biddle either as grantor or trustee, but is a power which can only be exercised with the consent of a majority of the trustees and is subject to the reasonably definite external standard of necessity which under the laws of New York would subject her, as one of the trustees, to the control of a court of equity in case of its abuse. *Phipps* v. *Commissioner, supra; Cushman* v. *Commissioner, supra.*

We do not have here a case such as *Commissioner* v. *Buck, supra.* In that case there was a power held by the settlor in his individual capacity:

* * * to alter or amend in any respect whatever the provisions of this indenture relating to the disposition of the income and principal of the trust estate or of the separate shares into which the same may be divided and to change any beneficial interest hereunder. * * *

and all without the restraint of any standard whatever. Nor is this case at all like the case of *Stockstrom* v. *Commissioner,* 148 Fed. (2d)

491. There not only did the grantor-trustee have unusual and extraordinary powers of control, but he had the full right to apportion or withhold income in his discretion, to accumulate income in favor of the remaindermen as against the life beneficiary, to deal with the corpus as if he were the individual owner thereof, to hold trust assets without divulging the trusts, and to retain possession of trust property and to remove it to any place he chose. The bundle of rights retained by both Buck and Stockstrom was so great that it was thought that the economic ownership of the trust corpus had been retained by the grantor within the meaning of the *Clifford* doctrine. It seems to us clear that Mrs. Biddle never retained either as grantor or trustee rights in any degree comparable with those appearing in the *Buck* and *Stockstrom* cases. Such powers as were exercisable by the trustees in this case were designed entirely for the benefit and protection of the trust estate and in the interest of the beneficiaries and were not and could not be exercised to Mrs. Biddle's personal economic advantage.

The respondent further submits that the income from the property transferred in trust by Mrs. Biddle was only temporarily reallocated within the family group and thereby she indirectly enjoyed its benefits. It is clear that Mrs. Biddle was under no legal or moral obligation to supply her husband with funds to defray the added entertainment and living expenses incident to his diplomatic post. It is equally significant that his share of the trust income was distributed directly to him without restriction. The same may be said of the moneys paid over to her children. The income of the trusts was paid directly into their personal bank accounts. No restriction was placed on their use of these funds and they alone had the power to draw on those accounts, which they did at will. None of the income was ever applied by the trustees to the maintenance, support, or education of the children. Mrs. Biddle continued to support the children and reimbursed them for such amounts as they spent for schooling, traveling, and other expenses from their personal funds.

At the time the trust was established there existed little possibility that the trust income would ever be used to support the minor children. Theodore Schulze, Sr., the father of Mrs. Biddle's two children, was alive and apparently in good health and presumably capable of supporting his children. *Commissioner* v. *Yeiser*, 75 Fed. (2d) 956. The parents were divorced in Paris in 1926. The decree of divorce made no provision for the support or custody of the children, but it did recognize the existence of a prior agreement between the parties in which Schulze agreed to be responsible for the children's support while they were with him, and also agreed to pay a specified sum for their support while they were with their mother. The obligation of

Schulze to support his children even after the divorce is clear. *Schacht* v. *Schacht*, 62 N. Y. S. (2d) 488; *Anonymous* v. *Anonymous*, 12 N. Y. S. (2d) 837. The subsequent marriage of Margaret T. Schulze to Anthony Biddle did not shift the burden of support to the latter. *Johnston* v. *Johnston*, 31 N. Y. S. (2d) 126.

The completeness of Mrs. Biddle's disposition of the funds conveyed by her to the trust is clear. The trust was not for a short term, but for the lives of the beneficiaries. The reversionary interest in the grantor was so remote as to be virtually nonexistent. *Cushman* v. *Commissioner*, *supra*. No power was retained by the trustor to revoke the trust, to alter or amend its terms, to change the beneficiaries, to vote the securities held by the trust, or to vary or change the beneficial interests created therein. In our opinion, it may not be said that Mrs. Biddle remained the owner of the corpus after this trust was established within the meaning of section 22 (a) of the Revenue Act of 1936 and the doctrine of *Helvering* v. *Clifford*, *supra*.

The final issue for determination herein relates to the taxability of the petitioner upon the trust income paid over in 1937 to her children, Theodore Schulze, Jr., and Boyce Thompson Schulze. Respondent, at the trial and on brief, has relied upon section 167 of the Revenue Act of 1936 and the doctrine of *Helvering* v. *Stuart*, *supra*, although no mention of this was made in the deficiency notice. The basis of his contention is that Mrs. Biddle was under a legal obligation to support her children in 1937 and that the trust income paid to her children in that year could be used for their support and maintenance.

From what we have already said, it seems obvious that section 167 has no application to the facts in the present case. Respondent does not suggest that Mrs. Biddle was legally obligated to support her children at the time she established the trust in question, or that she could have reasonably anticipated that such an obligation for their support might arise in the immediate future. In July 1935, when their father was the only person primarily obligated for their support, there vested in each child an indefeasible life interest in one-third of the trust income. Concurrently, Mrs. Biddle surrendered and was divested of all ownership and interest in the trust property. Under these circumstances, we are of the opinion that it was immaterial from whom the children received the property which formed the source of their income after July 1935. The fact is undisputed that they possessed income and property in subsequent years more than sufficient to meet their own needs. Thus, it can not be contended that a legal obligation on the part of Mrs. Biddle to support the children arose at the death of her husband on September 22, 1936. Under New York law, no obligation is imposed upon the mother to

support her children so long as each child has property of its own. *In re Giegerich's Estate*, 238 N. Y. S. 164;[1] *Welch* v. *Welch*, 200 N. Y. S. 652;[2] *In re Lyons' Estate*, 137 N. Y. S. 171. The fact that it was Mrs. Biddle and not some other interested party who had provided the children with the income-producing property in 1935 does not form a sufficient basis for holding that a legal obligation arose on her part to support her children upon their father's death and that the trust income could be used to relieve her of this obligation.

Moreover, apart from trust income, Theodore was the owner of securities in 1937 that brought him over $40,000 in dividends. While it is true that he purchased the stock in part with moneys he received from the trust, the fact remains that the dividends came to him directly from the property he then independently owned. Also, as stated in our findings, he had on deposit in the bank at the beginning of 1937 over $20,000 in cash and Boyce had in her own right, and apart from any income she may have received in 1937 from the trust, over $30,000 on deposit in the Bankers Trust Co. as of January 2, 1937. It would thus seem that, apart from their interest in the trust fund, Theodore and Boyce held in their own right sufficient funds to provide for their support. As a mother's obligation, under New York law, is at best but a secondary one, it would appear that the financial condition of the children during the entire year 1937 was such that no obligation arose on the part of Mrs. Biddle as the mother of these children to support them.

If, however, we should accept respondent's premise that upon the death of their father there arose an obligation on the part of Mrs. Biddle to support her children, it may be that the *Stuart* rule applies to the income of this trust for the year 1937, subject to the following

---

[1] "The question is whether the mother is required to support such children to the limit of her financial ability or whether the support, etc., of each child shall be paid out of the income of the trust fund for his or her benefit. * * * 'This court has held, where a father is of sufficient means, he must support and maintain and educate his children without having recourse to their property. *Matter of Jeffrey's* [Estate (Sur.)] 137 N. Y. S. 168. While that is the law in this state, as shown by an abundance of authority, it does not seem to be the law in this state in reference to a mother. It appears that a mother is not obliged to support her child, even if she has means, so long as the child has property of its own.' * * *. In *Cuming* v. *Brooklyn City R. Co.*, 109 N. Y. 95, 100, 16 N. E. 65, 67, the court observed that: 'The legal obligation of maintenance and support resting on the mother is especially imperfect. In all cases it necessarily can be enforced only in cases of the pecuniary ability of the parent, and in case of the mother the child's means are first chargeable with his support.' In *Welch* v. *Welch* (Sup.) 200 N. Y. S. 652, 655, the court held: 'That, when it is necessary to pay out money for the support and education of infant children, the widowed mother may be allowed to make such disbursements from the funds of the infant before resorting to her own.' "

[2] "I hold that no mother can be paid (and few would want to be) for those ministrations which only a mother can give to children, but that, when it is necessary to pay out money for the support and education of infant children, the widowed mother may be allowed to make such disbursements from the funds of the infant before resorting to her own."

considerations: By section 134 (a) of the Revenue Act of 1943, there was added to the code section 167 (c), which modified the rule in the *Stuart* case and, we think, made it entirely inapplicable here. The effect of this provision was to reinstate the rule as this Court had laid it down in *E. E. Black*, 36 B. T. A. 346, which would tax to the grantor only so much of the income of a trust established for minor children as was in fact used for that purpose and not what might have been used, as held in the *Stuart* case.

For a taxpayer to get the benefit of section 167 (c), it is necessary that there be filed certain prescribed consents in accordance with regulations of the Commissioner. Sec. 29.167–3, Regulations 111; T. D. 5392, 23 C. B. 328, 1944. Inasmuch as the first suggestion petitioner had that the respondent was asking for the application of the *Stuart* principle was at the hearing of this case, there was no occasion for the filing of consents, and it was not until after this case was heard that the consents, in fact, were filed. The regulations provide that the Commissioner may grant a reasonable extension of time "if request for such extension is filed with the Commissioner prior to the date heretofore fixed for the filing of the consent, or within a reasonable time thereafter, and a showing is made to his satisfaction (1) that unusual circumstances exist such as a case involving taxation of the grantor under the rule of *Helvering* v. *Clifford*, 309 U. S. 331, and (2) that the granting of the extension will not jeopardize the interests of the government."

The tax in question has already been paid by Mrs. Biddle's children and we can see no possible way in which the interest of the Government could be jeopardized by a delay in the filing of the consents. Otherwise, the delay appears to fall within the exception of the respondent's regulations, as we have held that the facts do not bring this case within the *Clifford* rule. In the circumstances, if the consents as filed do not fully meet the Commissioner's requirements, it is assumed that this Court will allow a reasonable time for petitioner's compliance therewith. *J. M. Leonard*, 4 T. C. 1271, 1287; *Estate of O. M. Banfield*, 4 T. C. 29, 34.

We are, therefore, of the opinion that petitioner is not taxable on the income of this trust, either under section 22 (a) of the Revenue Act of 1936 and the *Clifford* principle, or under section 167 of the Revenue Act of 1936 and the doctrine announced in *Helvering* v. *Stuart, supra.*

Reviewed by the Court.

*Decision will be entered under Rule 50.*

HILL, *J.*, concurs only in the result.